IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KEVIN FUREY                    :        CIVIL ACTION
                               :
        v.                     :
                               :
TEMPLE UNIVERSITY, et al.      :        NO. 09-2474

------------------------------

                          MEMORANDUM

McLaughlin, J.                                    August 2, 2010


        This action arises out of a decision made by Temple

University to expel an undergraduate student, Kevin Furey,

because of an altercation he had with Travis Wolfe, an off-duty

police officer, near campus on April 5, 2008.  Furey brings a

number of claims against Temple University and various Temple

employees[1] relating to his expulsion.  He seeks to have his

expulsion vacated and a new hearing conducted.

        The defendants have moved for summary judgment on all

claims.  The Court will grant summary judgment on all claims

except the claim that Temple and the individual defendants

---

[1]    The plaintiff names as defendants: Temple University;
Theresa Powell, Vice President of Student Affairs; Anne Weaver
Hart, President; Brian Foley, University Vice Code Administrator;
Ainsley Carry, Dean of Students; Andrea Seiss, Associate Dean of
Students; M. Moshe Parat, Dean, Fox School of Business; Temple
University Review Board; Richard Greenstein, Professor and Chair
of the University Disciplinary Committee; Keith Gumery, Professor
and Vice-Chair of the University Disciplinary Committee; Diane
Adler, Professor and member of the University Disciplinary
Committee; Jonathan Scott, member of the Faculty Review Board;
Bonita Silverman, member of the Faculty Review Board; Valerie
Harrison, Judicial Officer of the Student Conduct Committee; and
the Trustees of Temple University.

violated the plaintiff's right to procedural due process in the expulsion process.  The Court finds that there are material issues of fact in dispute that preclude summary judgment as to Temple and several of the individual defendants on the due process claim.  The Court will grant summary judgment on all claims as to certain defendants who were not at all involved in the expulsion process.


I.   The Summary Judgment Record

On a motion for summary judgment, the Court considers the evidence in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The summary judgment record consists of: Temple's Code of Conduct; the transcript of the hearing that led to the plaintiff's expulsion; depositions taken in this case; depositions from other cases; records of the criminal case that was brought against the plaintiff for the same incident that was the cause of his expulsion; records of the Internal Affairs Investigation of Officer Wolfe's conduct on the night of the incident; documents and letters concerning the plaintiff's hearing and appeal; and certain newspaper articles and internet materials.

A.   <u>Temple's Code of Conduct</u>

The jurisdiction of Temple's Code of Conduct extends to behavior on the University's campus and 500 yards beyond.  The Code's mission is to place reasonable limitations on student conduct to maintain a safe environment.  Temple Code of Conduct, Def. Exhibit B, 2. ("Def. Ex. B")  The Code furthers this mission by regulating academic integrity, behavior, alcohol and drug consumption, security on campus and by maintaining disciplinary procedures.

When an incident occurs that could be a violation of the Code, the University Code Administrator determines whether to charge the student with violations of the Code.  After bringing charges, the Code Administrator must provide the student charged with a notice of the violations and with hearing information, the identity of witnesses and a description of any evidence filed with the charges.  Def. Ex. B, 3.

The Administrator also determines the appropriate hearing process and notifies the investigative body.  In making this determination, the Administrator considers the severity of the potential sanction and the complexity of the factual dispute. Def. Ex. B, 10-11.

There are five different bodies that hear charges of violations of the code.  Complex cases, or those involving the most severe sanctions, are referred to the University

Disciplinary Committee ("UDC") Hearing Panel ("Full Panel").  The Full Panel is composed of three faculty members, one of whom is the chair, and two students.  Three other panels, including the Conference Board, handle less complex cases with less severe sanctions.  The Review Board consists of two students, two faculty members and one administrator.  Def. Ex. B, 11.

The Full Panel is a fact-finding panel and its proceedings are non-adversarial where rules of evidence, standards of proof, and other elements of court proceedings do not apply.  Def. Ex. B, 3.  A Full Panel hearing occurs thirty business days after the pre-hearing meeting, but the time limits may be extended.  During the hearings, the University has the burden to prove the charges brought against the student under a more likely than not standard.  Students have the opportunity to conduct a defense, offering their own testimony, witnesses, and evidence.  Students also have the chance to question witnesses testifying at the hearing through the presiding chairperson.  Id. at 12.

When a student wishes to present witnesses who are members of the Temple community, the student can request that the Code Administrator issue notices requiring the witnesses' appearance at the hearing.  Def. Ex. B, 12.  If evidence is presented that was not included with the original hearing notice, the student may have time to examine and respond to it.  Id. at

4

13.    Students are permitted to have an advisor or attorney help in preparing for the hearing and attend the hearing itself.  The advisor or attorney cannot question witnesses or address the hearing body, but can advise the student during the hearing.  The Dean of the School that the student attends, the Dean of Students, and the Vice President for Student Affairs or their designee may attend hearings as observers.  The hearing body deliberates and determines a violation by majority vote and then recommends a sanction.

When a student is found to have committed a violation of the Code and receives a sanction of suspension or expulsion, the student may appeal directly to the Review Board.  Def. Ex. B, 14.  The appeal must be based upon (1) availability of new evidence, (2) procedural defects preventing a full and fair hearing, (3) insufficiency of evidence supporting the decision, or (4) sanctions grossly disproportionate to the offense.  The appeal must be filed with the Code Administrator, and must state the reasons for appeal.  If the Review Board decides that the sanctions are grossly disproportionate, they may recommend modified sanctions.  If the Review Board finds procedural defects preventing a fair hearing, they will recommend that there be a new hearing before a new panel.  If the Review Board finds that the decision could not have been reached based on the evidence, they will recommend that the decision and sanctions be modified.

These recommendations are conveyed to the Vice President of Student Affairs, who then reviews the entire record and makes a final decision, or has his or her designee do so.  In his or her review, the Vice President for Student Affairs must give presumptive weight to the Review Board's recommendations.  After the final decision, there is no further review of the decision or sanction.

B.   Incident & Criminal Proceedings

        The facts surrounding the plaintiff's April 5, 2008, encounter with Officer Wolfe are disputed.  Whether the defendants violated the plaintiff's rights in the expulsion process does not depend on whose version of events is correct, but a description of the undisputed and disputed aspects of the encounter is helpful to understand the issues surrounding the disciplinary process.  The parties generally agree about the events leading to the incident, but diverge regarding certain details, which the Court will note.

        In the spring of 2008, Kevin Furey was enrolled in Temple University as a full-time undergraduate student.  Request for Admissions, Def. Exhibit H, 2. ("Def. Ex. H")  On April 4th, 2008, he was visiting a friend just off Temple's campus.  Hearing Transcript, Pl. Exhibit D, 134. ("Pl. Ex. D")  After spending some time and consuming some alcohol at a party, the plaintiff

returned to his friend's house in the early morning hours of April 5, 2008.  The plaintiff's friend locked himself out of his bedroom, and the plaintiff went to retrieve a machete from his car to pry open the bedroom door.  Id. at 135.

While the plaintiff was at or around the trunk of his car, a number of men,[2] who the plaintiff believed might try to attack or mug him, approached him, and one of them had a gun. Pl. Ex. D, 136.  There were shouts indicating that the man with the gun, Travis Wolfe, was a police officer, but the plaintiff hesitated to believe that and failed to drop his machete.  The plaintiff eventually threw down the machete, and Wolfe threw him to the ground, kicking and eventually subduing him.[3]  Id. at 137-38.  The plaintiff was subsequently arrested by Temple police officers, after Wolfe identified himself as an off-duty police officer.  Id. at 140.

---

[2]   It is unclear whether Wolfe was alone or with others.  The plaintiff claims that around 5 people approached him.  Pl. Ex. D, 136.  Wolfe claims that he got out of his car alone.  Pl. Ex. D, 20.  Wolfe's companions' statements support his claim that he got out alone.  Robinson Deposition, Pl. Exhibit R ("Pl. Ex. R"), Anderson Statement, Pl. Exhibit S. ("Pl. Ex. S"), Carry Deposition, Pl. Exhibit T ("Pl. Ex. T")

[3]   Contrary to the plaintiff's assertions, Wolfe insists that he was in his car, saw an individual brandishing something that could have been a gun, and stopped and approached the plaintiff with his gun out, identifying himself as a police officer and showing his badge at his waist.  Pl. Ex. D, 20.  Wolfe contends that the plaintiff raised the machete in combat mode and approached him before eventually dropping it.

7

Because of the severity of his injuries, Police Central Booking refused to admit the plaintiff before he went to the hospital.  Pl. Ex. D, 140.  At the hospital, the plaintiff was triaged and had CAT scans to determine the nature of any head injuries.  Id. at 141.  The hospital records made no mention of the plaintiff testing positive for alcohol or of any suspicion of alcohol use.  Id. at 169.  The plaintiff's arrest occurred within 500 yards of Temple property, thus within the jurisdiction of Temple's Student Code of Conduct.  Def. Ex. H, 2.

After his release, the plaintiff was charged with aggravated assault on a police officer.  Preliminary Hearing Transcript, Def. Exhibit I.  He appeared in Municipal Court before Judge Jimmie Moore in a preliminary hearing on April 15, 2008.  Wolfe testified at the hearing.  Judge Moore continued the case, and the plaintiff again appeared before Judge Moore on November 24, 2008.  Preliminary Hearing Transcript, Def. Exhibit J.  At this hearing, the plaintiff made a statement admitting the truthfulness of Wolfe's testimony and apologizing as a precondition to participating in the ARD proceedings.[4]

---

[4]     The plaintiff asserts that his statement was a condition to being placed in the ARD program, and at the ARD hearing on June 10, 2009, the conditions were altered and he no longer had to agree to these terms, apologize or verify Wolfe's version.  The plaintiff also states that he believed that he had no choice but to agree to the terms due to Internal Affairs' desire to protect Wolfe.  Pl. Opp., 22-23.

C.   <u>Notice, Pre-Hearing and Hearing Scheduling</u>

Temple began disciplinary proceedings against the plaintiff by a letter dated April 10th, 2008, notifying him that he was charged with violating the Code of Conduct and would be required to schedule a pre-hearing.  The plaintiff was charged with violating Sections 3, 8, and 12 of the Code and given a version of the specifications of the events leading to the charge.[5]  Section 3 prohibits acts or threats of intimidation or physical violence towards another, including actual or threatened assault or battery.  Section 8 prohibits the use or possession of articles endangering a person's health or safety, including knives or other weapons.  Section 12 prohibits students from engaging in disorderly conduct.  Letter to K. Furey, Def. Ex. A.

The plaintiff requested and received a delay of the pre-hearing until after May 5th so he could finish the semester.  The hearing was further delayed until December 2008.[6]  At the pre-hearing, the plaintiff and his lawyer/mother Margaret Boyce Furey met with Code Administrator Andrea Seiss and Associate General Counsel Valerie Harrison to discuss the incident and the

---

[5]   This statement of the events leading to the charge reflected Wolfe's version of the events.

[6]   The plaintiff claims that there was no explanation for the delay of the hearing.  Pl. Opp., 23.  The defendants claim that it was delayed because the plaintiff did not initially re-register at Temple, and it was his responsibility to reschedule the hearing.  Def. Motion, 15.

hearing.  Def. Ex. H, ¶23; Kevin Furey Deposition, Def. Ex. M,
79:5-24 ("Def. Ex. M")

The plaintiff requested the names and contact
information of the men accompanying Wolfe, and eventually
received the names Steven Robinson, Colin Anderson and Douglas
Segars.  However, Temple did not provide contact information for
these witnesses.[7]  Letters between Pl. and Def., Pl. Ex. N.


D.   <u>Hearing</u>

On March 25th, 2009, the plaintiff's UDC Hearing was
conducted before a full panel of five individuals.  Pl. Ex. D, 6.
Professor Richard Greenstein chaired the panel and the other
faculty representatives were Professor Diane Adler and Professor
Keith Gumery.  The student panel members were Lisa Krestynick and
Malcolm Kenyatta.  Code Administrator Brian Foley and Associate
General Counsel Valerie Harrison also attended the hearing.
Greenstein, Adler, Foley and Gumery Depositions, Pl. Ex. H.
Harrison had previously attended approximately six disciplinary
hearings.  Requests for Admissions, Pl. Ex. K.  The plaintiff's
mother and father attended, acting as his attorney/advisor and
advisor respectively.  Pl. Ex. D, 9.  Absent from the hearing
were the officers who helped Wolfe arrest the plaintiff and the

---

[7]    The defendants claimed that they could not provide it under
the Family Educational Rights and Privacy Act ("FERPA").  Colin
Anderson and Douglas Segars are Temple University Students.

three eyewitnesses accompanying Wolfe.  Id. at 10-11.  The
plaintiff requested a continuance to obtain the witnesses'
presence, which Greenstein denied.[8]  Id. at 13.

At the beginning of the the hearing, the plaintiff was
charged with the three violations of the Code set forth in the
notice sent to him, and the plaintiff confirmed that he received
the incident specifications provided on a summary sheet.  Pl. Ex.
D, 7-8.  The plaintiff and the panel then confirmed that the
panel could be fair and impartial in considering the matter.  Id.
at 9.  The panel was unaware of the specifics of the case prior
to the hearing, but was provided with a sheet with background
information that was not to be considered as evidence. This
information sheet recited Wolfe's version of the events.  Adler
Deposition, Pl. Exhibit I, 39:11-14; Pl. Ex. D, 15.  The panel
acknowledged that they would make their decision entirely based
on the evidence from the hearing.

First to testify for the University was Officer Wolfe,
who described the events of the morning of April 5, 2008, in
long, mainly uninterrupted statements.  Pl. Ex. D, 19-23.

---

[8]   Temple has no power to subpoena the witnesses or in any
other way compel them to attend beyond imposing disciplinary
sanctions to the two Temple students who were contacted regarding
the hearing, Anderson and Segars.  Pl. Ex. D, 13.  Segars'
deposition indicates that he does not remember being contacted
regarding the hearing and that he would have attended the hearing
had he gotten the notice.  Segars Deposition, Pl. Response
Exhibit B, 129-130. ("Pl. R. Ex. B")

11

Pursuant to the Code, the plaintiff was allowed to direct his questions to testifying witnesses only to the panel, specifically Professor Greenstein, who then posed questions to the witnesses. Id. at 16.  During Officer Wolfe's testimony, the plaintiff posed a number of questions to the panel, some of which Greenstein was reluctant or refused to ask altogether.  Id. at 40-41, 49, 79-81. The plaintiff disputed much of Officer Wolfe's testimony, and attempted to highlight the discrepancies via questions and paper evidence of Wolfe's prior testimony.  Id. at 51.  After a recess, while Wolfe was still under oath and testifying, Wolfe read a prepared written statement into the record, referring to his exoneration by an Internal Affairs Investigation and to the plaintiff's statements at his prior criminal hearing in which the plaintiff admitted Wolfe's version of events and apologized. After Wolfe made this statement, the plaintiff pointed out to the panel that it appeared that Officer Wolfe had been on the phone during the recess prior to making this prepared statement.  Id. at 55-57.

The University then called Officer Brian Crawford and Sergeant Ken McGuire of the Temple Police Department.  Pl. Ex. D, 101; 118.  Both of these officers responded to the scene after Officer Wolfe took the plaintiff into custody.  The officers who immediately responded to the scene and took the plaintiff to the hospital were not present at the hearing; both were unavailable

12

for personnel or leave reasons.  The plaintiff noted that he was
not alerted to the unavailability of these witnesses and was not
allowed to reschedule when important witnesses did not show up.
Id. at 129-130.

        The plaintiff then testified to the events himself.
Pl. Ex. D, 134.  In questioning the plaintiff about his fear of
attack or robbery, Professor Greenstein stated to the plaintiff,
"I'm trying to understand why a Philadelphia Police Officer would
want to attack you for money."  Id. at 149:3-5.  The plaintiff
and his father both state that while off-the-record, Professor
Greenstein asked, "Why would a Philadelphia Police Officer lie?"
K. Furey and G. Furey Depositions, Pl. Exhibit F, 148:21-24,
65:9-16.  The plaintiff questioned Wolfe's credibility, bringing
up his violence-influenced childhood.  Pl. Ex. D, 150.

        The plaintiff also testified to the behavior and
appearance of Wolfe and others to explain his fear that he was
being attacked by a gang.  Pl. Ex. D, 157, 180.  Professor Gumery
asked the plaintiff for his definition of a gang and then
inquired whether a group of people wearing Hawaiian shirts would
be perceived as a gang.  Id. at 180-81.  During student Malcolm
Kenyatta's questioning of the plaintiff, Kenyatta became
confrontational, refusing to let the plaintiff clarify until
Professor Greenstein interjected, "[l]et him clarify what he
thinks he said."  Id. at 159:13-14.

                              13

Professor Adler, a nursing school professor, questioned the plaintiff on the procedure used when he was brought to the hospital and on his alcohol consumption.  Pl. Ex. D, 164-170. Professor Adler stated that according to the hospital record, he "tested positive for alcohol."[9]  Id. at 183:20.  While questioning him, she said "[n]ot everybody can be lying and, you know, be wrong . . . Hillary heard of conspiracies too."  Id. at 185:2-6.

The plaintiff testified to the reason he had a machete in the trunk of his car.  He explained that his parents' property in Whitemarsh township was large and he had been clearing vines on the property, so he used the trunk of his car as a toolbox. Pl. Ex. D, 147-48.  When driving to the city on the evening of the incident, he believed that he was going only to his friend's off-campus house near Temple, which he did not consider a part of Temple.  Id. at 190.  The plaintiff knew that he had his father's machete in the trunk of his car and decided to use it as a crowbar when his friend was locked out of his room.  Id. At 135, 147.  The plaintiff's father, George Furey, corroborated the plaintiff's testimony.  He explained that their property had been unoccupied for a number of years and was overgrown.  Id. at 222-23.  He said that in the spring and fall, they cut through

---

[9]    The record did not indicate that the plaintiff tested positive for alcohol while at the hospital.  Adler Deposition, Pl. Ex. E, 13-16; Letter from Dr. Alfred Sacchetti, Pl. Ex. MM.

vegetation on the property and it was not uncommon for him and his son to have machetes and other tools in the trunks of their cars.  G. Furey described the machete as having an 18-inch blade and a 4 or 5-inch handle.  The machete could be purchased for $12 at any gardening center.  Id. at 223.

After the plaintiff's own testimony, he called his friends John Fisher, Brian Bairden and Andrew Haff to testify about the events of the night and as character witnesses.  Pl. Ex. D, 191; 212; 216.  Finally, the plaintiff presented his mother and father as character witnesses.  Id. at 223, 232.

Throughout the hearing, the panel was courteous to Wolfe and unchallenging to his testimony, allowing him to speak relatively uninterrupted.  The plaintiff tried to question Officer Wolfe about whether he had been at a party, some statements he made at the plaintiff's preliminary hearing, and whether he telephoned Internal Affairs during the plaintiff's hearing.  The panel refused to pose these questions to Officer Wolfe.  Then the panel aggressively questioned the plaintiff during his testimony.  Pl. Ex. D, 49, 55, 79, 82, 100, 159, 162. The plaintiff says in his deposition that during the hearing Officer Wolfe and General Counsel Harrison seemed friendly, and after the panel recommended expulsion, the plaintiff observed them looking at him "laughing, kind of like they were congratulating each other on a job well done."  K. Furey

15

Deposition, Pl. Ex. L, 29-30.  During the hearing, both the plaintiff and his mother were warned to be quiet, and the plaintiff's mother was told to "shut up."  Pl. Ex. D, 56, 181.

After all the witnesses testified, everyone except the panel and Foley, the Code Administrator, left the room for deliberation.  <u>Id.</u> at 238.  The panel reached the unanimous decision that the plaintiff was responsible for the charged violations of the code.  <u>Id.</u> at 238.  The panel then asked the plaintiff questions during the sanctions stage, and after deliberation announced their recommendation that he be expelled. <u>Id.</u> at 238, 242-43.

###### E.    <u>Appeal and Final Decision</u>

The plaintiff promptly appealed the decision to the Review Board.  His counsel sent three letters on his behalf, dated March 27, March 30 and April 15 of 2009, to Dean Carry setting forth his grounds for appeal.  Letters to Carry, Def. Exhibits W, X, and Y.  When the Review Board met on April 24, 2009, they considered all of the plaintiff's 27 grounds for appeal although a number of the grounds for appeal were not recognized in the four categories for appeal allowed in the Code of Conduct.  Review Board Decision, Pl. Exhibit AA.  ("Pl. Ex. AA")

After consideration, the Review Board found a basis for appeal in three of the plaintiff's claims.  The Board found by a majority vote that there was not sufficient evidence to find him responsible for violating section 3 of the Code, which prohibited acts or threats of intimidation or physical violence.  By a unanimous vote, the Board found that the sanctions were disproportionate to the violations, instead recommending a semester suspension.  Finally, by a unanimous vote, the Board found that the fact that panel member Malcolm Kenyatta was a Facebook "friend" with Officer Wolfe "constitute[d] a procedural defect" in the proceedings.  For this, the Board recommended that the Code Administrator follow up with the panel member to further investigate.[10]  Pl. Ex. AA.

Code Administrator Foley investigated the procedural defect by asking Kenyatta if he and Wolfe were friends.  Kenyatta told Foley that he and Wolfe were friends on Facebook, but he had over 400 friends, and they were not "friends" in the traditional sense.  Foley Deposition, Def. Exhibit E, 42-43.  The plaintiff, however, claims more than a mere Facebook friendship between Kenyatta and Wolfe and his associates.  Depositions indicate that Kenyatta and Wolfe may have known each other through or been members of the organization Goodfellaz, and there is a picture of

---

[10]    The Code states that if a procedural defect is found, the Review Board will recommend to the Vice President for Student Affairs that a new hearing be held before a new panel; however, a new hearing was never scheduled.  Def. Ex. B, 15; Pl. Opp., 14.

Kenyatta and witness Doug Segars together.  Seiss Deposition, Pl.
Exhibit PP, 93-94; Pl. Exhibit AA.

Once the Review Board reaches a decision, their
recommendations are conveyed to the Vice President of Student
Affairs or his or her designee.  Def. Ex. B, 15.  In this case,
Dean Carry reviewed the record from the hearing and the Review
Board as the Vice President of Student Affairs' designee.  Powell
Deposition, Pl. Exhibit CC, 43; Carry Deposition, Pl. Exhibit DD,
8 ("Pl. Ex. DD").  To make the decision, Carry reviewed the
plaintiff's appeal letters, along with anything attached to those
letters, and the audio transcript of the hearing.  Pl. Ex. DD, 8.
He did not review any of the paper evidence submitted at the
hearing, including Wolfe's writing "Media and My Childhood,"
letters requesting witness information or the hospital record.
Id. at 9-10.  Dean Carry was faced with split recommendations –
with the Hearing Panel recommending expulsion and the Review
Board recommending suspension.  Id. at 73.  In facing this split
decision, Dean Carry said he considered that "whenever a student
is involved with an altercation with an officer, whether it be a
weapon or machete, there's an altercation with an officer, we
have expelled those students consistently."  Id. at 73:13-16.

At first, Dean Carry denied in his deposition that the
Code of Conduct said that a presumption should be made in favor

of the Review Board.[11]  When the text of the Code was read to him, he acknowledged the required presumptive weight, and said he gave presumptive weight to the Review Board's recommendation, claiming to have considered their decision more than the panel decision.  But he ultimately concluded that "we have expelled students that have had physical altercations involving weapons and police officers."  Pl. Ex. DD, 74-75.  Thus, Carry conveyed his recommendation that the plaintiff be expelled to Vice President of Student Affairs Powell.  Powell then sent a letter to the plaintiff informing him of his expulsion from Temple University.  Expulsion Letter, Compl. Exhibit D.

    F.    Other Noteworthy Events

        A number of other significant events happened either during the time of the hearing and appeal or afterwards.  First, witness Douglas Segars states in his deposition that sometime before the expulsion he spoke with Dean Carry about the incident, although it is not clear who contacted whom.[12]  Segars stated that he did not remember getting a notice to appear at the hearing, and if he had, he would have attended.  Pl. R. Ex. B,

_____

[11]    The Code states that in making a final decision, the Vice President for Student Affairs, or his or her designee, must give presumptive weight to the Review Board's recommendations.  Def. Ex. B, 15.

[12]    Dean Carry claims that Segars contacted him because he had seen his name appearing in a newspaper story about the event. Pl. Exhibit T, 40.

130-32.  Additionally, witness Stephen Robinson stated that he believed that he received a phone call from Temple asking if he could attend something.  Robinson Deposition, Pl. Exhibit O, 81:13-16 ("Pl. Ex. O").  When he responded that he was at work, they said they did not need him.[13]

Both Robinson and Segars testified at deposition to the events of the morning of April 5, 2008, and Anderson signed a statement about them.  Their statements about the events differ slightly from Wolfe.  Pl. Exs. R, S, and T; Pl. R. Ex. B.  These statements concern whether the plaintiff approached Wolfe or the other way around, whether the plaintiff had the machete in his pants, and whether the trunk of the plaintiff's car was opened or closed.

After the expulsion, on June 10, 2009, the plaintiff had his final ARD meeting, where he agreed to probation, anger management and alcohol classes.  ARD Form, Pl. Response, Exhibit C.  These ARD forms did not mention the statement the plaintiff made at the preliminary hearing in 2008 admitting Wolfe's version and apologizing.

The Internal Affairs Report regarding Wolfe's actions, dated February 27, 2009, found that although he was exonerated of the allegation of physical abuse against the plaintiff, Officer Wolfe violated department policy when he did not first call for

---

[13]    Robinson was subpoenaed and did testify at the Police Board of Inquiry meeting regarding the incident.  Pl. Ex. O, 83.

backup when the plaintiff was not immediately confronting anyone.
IAD Report, Pl. Exhibit FF, 7.   The report states: "Officer
Wolfe's actions or his presumptions of imminent danger were
unfounded or a figment of his imagination up to that point.   It
was not until he confronted Mr. Furey [that] the incident
escalate[d] into a confrontation."   The plaintiff's attorney sent
a letter to Powell regarding this violation of police procedures
on June 9, 2009, which was unanswered.   Letter to Powell, Pl.
Exhibit GG; Pl. Opp., 29.


II.   The Complaint and the Defendant's Motion

        The second amended complaint contains eight counts.
The Court will describe the counts as does the complaint: count 1
– due process against all defendants; count 2 - denial of a
hearing before a fair and impartial panel against defendant,
disciplinary hearing panel, and defendants, employee of student
affairs; count 3 - equal protection violations against all
defendants; count 4 - deprivation of property rights without due
process against all defendants; count 5 - breach of contract
against defendant University and its Trustees, violation of
constitution rights and common law rights; count 6 - deprivation
of property rights to a higher education against all defendants;
count 7 - retaliation claim against all defendants; count 8 - due

process violation against all defendants, expulsion based on perjured testimony of Travis Wolfe.

The defendants move for summary judgment on all of the plaintiff's claims.  They argue that (1) the plaintiff's due process claims are legally insufficient, (2) the plaintiff's claims for deprivation of property are moot as he has received his transcripts and credits, (3) the plaintiff's equal protection and breach of contract claims fail as a matter of law, and (4) the plaintiff's retaliation claim fails to state a claim upon which relief can be granted.  In addition, certain defendants argue that even if the Court concludes that summary judgment is not appropriate as to all defendants, summary judgment should be granted to them on the ground that they had no involvement in the plaintiff's expulsion.[14]

## III. Discussion

### A.  Due Process

The Court will set out the legal principles applicable to the due process requirement in student disciplinary

---

[14]     Those defendants are Ann Weaver Hart, President of Temple University; M. Moshe Parat, Dean of the Fox School of Business; the Temple University Review Board and Review Board members Jonathan Scott and Bonita Silverman; and the Trustees of Temple University.

proceedings before discussing the plaintiff's myriad challenges to the process that led to his expulsion.

### 1.   Due Process in Student Disciplinary Hearings

The Supreme Court has issued two decisions on the procedural due process owed a student suspended or dismissed from a state school.  In the first, Goss v. Lopez, 419 U.S. 565 (1975), the Court held that the disciplinary suspension of a student required at least some measure of notice and some type of informal hearing.  The nature of the hearing will depend on the competing interests involved.  Id. at 579.

In Goss, a public high school student faced a 10-day suspension.  The Court held that, in that context, due process required that he be given oral or written notice of the charges against him and, if he denied them, an explanation of the evidence that the authorities have and an opportunity to present his side of the story.  Id. at 581.  For such a short suspension, the Court held that the hearing could occur almost immediately after the notice and did not need to afford the student the opportunity to "secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident." Id. at 582-83.  The Court cautioned that longer suspensions or expulsions might require more formal procedures.  Id. at 584.

In <u>Board of Curators of the University of Missouri v.</u>
<u>Horowitz</u>, 435 U.S. 78 (1978), the Supreme Court considered a
student dismissed for failure to comply with academic
requirements.  The Court distinguished between the suspension for
disciplinary reasons at issue in <u>Goss</u> and the dismissal for
academic reasons in <u>Horowitz</u>.  The Court held that, because the
academic process is not adversarial, dismissals for academic
reasons do not require a formal notice and hearing.  It held that
more stringent due process standards applied for decisions to
dismiss or suspend a student for disciplinary reasons.  <u>Id.</u> at
86.  The Court described disciplinary dismissals as involving
"the violation by a student of valid rules of conduct" or
"disruptive and insubordinate behavior."  <u>Id.</u> at 86, 90.

The United States Court of Appeals for the Third
Circuit considered a due process challenge to the suspension of a
student in <u>Palmer v Merluzzi</u>, 868 F.2d 90 (3d Cir. 1989).  In
<u>Palmer</u>, the court of appeals considered a suit by a high school
student placed on 10-day academic suspension and 60-day athletic
suspension for consuming beer and marijuana on school grounds.
The student had an informal meeting with the school
disciplinarian and the football coach when evidence of his
alcohol and drug use were found and the school sent written
notice to his parents before suspending him.  Neither the student
nor his parents protested his academic suspension, but when they

24

learned that the school was also considering an athletic suspension, his parents protested and his father had a 30 minute closed door session with the Board of Education to argue his son's case before the suspension was imposed.  Id. at 92.

     The Palmer court found that the suspension implicated the due process clause but that the student had received all the process he was due.  The Palmer court began with the level of due process found adequate in Goss.  The Court found that the student in Palmer had been notified of the nature of his offence before punishment was imposed and that the informal meeting with the school disciplinarian satisfied the requirement for a hearing. Id. at 94.  The Court also rejected the student's argument that he should have been given separate notice and hearing before being suspended for academic reasons, finding no requirement that a student be told all of the possible sanctions he might suffer before a notice and hearing.  Id.

     The Palmer court next considered whether a higher level of due process was required because the punishment imposed was greater than that imposed in Goss.  Id. at 95.  The student contended that his exclusion from athletics was a sufficiently great deprivation to require express notice that it was a possible sanction and to require an opportunity to retain counsel.  Id.  The Palmer court held that the school's governmental interest was the same as in Goss – to maintain order

25

and discipline without prohibitive costs and disruption – and that the additional procedures demanded by the student would not be materially different in efficacy.  The court held that the slightly greater deprivation to the Palmer student did not warrant the additional procedures.  Id. at 96.

The most recent Third Circuit case addressing the requirements of procedural due process involved an employee terminated by a school board for poor performance and inappropriate behavior.  Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ., 574 F.3d 214 (3d Cir. 2009).  In Biliski, the district court had dismissed the plaintiff's due process claims on the ground that he did not have a property interest in his continued at-will employment.  Id. at 219.  On appeal, the Third Circuit upheld the decision on different grounds, holding that, assuming that the employee had a property interest in continued employment, he had received due process before being terminated. Id.

The Biliski court determined what process was due the plaintiff by applying the analysis set out in Mathews v. Eldridge, 424 U.S. 319 (1976).  Mathews held that the identification of the specific dictates of due process generally requires consideration of three different factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through

the procedures used; and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

The Biliski court found that the plaintiff had a significant interest in his job, but that his employer had a significant countervailing interest in removing employees who fail to perform, display inappropriate behaviors, and have been warned to change their behavior, and in doing so without undue administrative costs. Biliski, 574 F.3d at 221. The court found that the most important factors to consider in a procedural due process analysis were the risk of erroneous deprivation from the existing procedure and the likely value of additional procedural safeguards. Id. Weighing these interests, the Biliski court found that the employee received disciplinary memos giving him notice of the behavior for which his employer sought to terminate him. Id. at 221-22 After his termination date, the employee had a chance to send a letter to the Board with the authority to terminate him. Id. at 222. The court held that the letter and the fact it was considered at the meeting provided the employee a meaningful opportunity to be heard and to give his version of events. Id. The court held that the plaintiff had failed to

show that additional procedural safeguards would have led to a different result.  Id. at 223.

Before the Supreme Court's decisions in Goss, Horowitz, and Mathews, the Third Circuit addressed due process for disciplinary proceedings in Sill v. Pennsylvania State University, 462 F.2d 463 (3d Cir. 1972).  The students in Sill challenged a special panel assembled by the University's Board to hear charges against a large number of students charged with disruptions on campus.  Id. at 466.  The Third Circuit held that the students had no due process right to be heard by a particular tribunal, and that the basic elements of procedural due process of notice and the opportunity to be heard "by a fair and impartial tribunal" were fulfilled.  Id. at 469.

Other Courts of Appeals have also opined on the process due a student suspended or expelled from a state school.  See, e.g., Flaim v. Med. Coll. of Ohio, 418 F.3d 629 (6th Cir. 2005)(applying Goss and Mathews and concluding that cross-examination and counsel were unnecessary for due process); Newsome v. Batavia Local Sch. Dist., 842 F.2d 920 (6th Cir. 1988) (holding that the burden of cross-examination outweighs its benefit, that contact between a disciplinary decision maker and the student's accusers was not impermissible, but that new evidence submitted by the accuser administrators during deliberations closed to the student violated due process); Gorman

28

v. Univ. of R.I., 837 F.2d 7 (1st Cir. 1988) (finding claim of
bias did not constitute a procedural due process violation, as
there is a presumption in administrative proceedings favoring the
administrators, and allegations of prejudice must be based on
more than speculation and inferences); Gabrilowitz v. Newman, 582
F.2d 100 (1st Cir. 1978) (holding that barring counsel in a
student's disciplinary hearing violated due process); Winnick v.
Manning, 460 F.2d 545 (2d Cir. 1972) (holding that a hearing did
not deny due process, as the decision was unbiased, cross-
examination would serve no useful purpose, and not every
deviation from a University's procedures is impermissible); Dixon
v. Ala. State Bd. of Educ., 294 F.2d 150 (5th Cir. 1961)
(requiring notice, containing a statement of the charges and
grounds for expulsion, and opportunity to be heard in more than
an informal interview for procedural due process in an
expulsion).

It is within this legal framework that the Court
considers the plaintiff's claim that he was denied due process in
his expulsion.

2.   <u>The Plaintiff's Due Process Challenge</u>

The plaintiff argues that his expulsion violated procedural due process in a variety of ways that amount to a challenge to the way the Code was applied to him.[15]   The Court has grouped these claims into seven categories:

    a.   bias and impartiality;

    b.   departures from the Code of Conduct;

    c.   right to remain silent;

    d.   no right to counsel or to cross-examination;

    e.   absence of witnesses and alleged perjured
         testimony;

    f.   consideration of evidence; and,

    g.   appeal and process of decision.

---

[15]   The plaintiff also makes two facial challenges to the Code. First, he argues that the Code is unconstitutionally vague and overbroad.  The defendants argue that the plaintiff did not raise this claim in his complaint so it should not be considered.  Even if properly raised, the claim would fail.  Codes of conduct for students in educational institutions do not have to satisfy the same standards for clarity as must criminal statutes.  <u>Sill</u>, 462 F.2d at 467 (citing <u>Esteban v. Cen. Mo. State Coll.</u>, 415 F.2d 1077 (8th Cir. 1969) (finding that flexibility and reasonable breadth were permitted in university regulations, which did not need to be held to the same standards as criminal statutes)).

Second, he argues that the Code violates due process because it allows the Code Administrator to choose the type of hearing, and the standard of proof is "more likely than not." The Court finds no constitutional infirmity in these aspects of the Code.  Allowing an administrator to tailor the hearing type to the complexity and seriousness of the charges makes sense in an educational setting.  As for the standard of proof, the decision to dismiss a student must be careful and deliberate.  A more likely than not standard is not inconsistent with that principle.

30

The Court describes below the arguments of the parties and any material facts in dispute with respect to each category.  The Court then explains whether and to what extent, the particular category impacts the Court's decision to deny summary judgment.

The Court concludes that taking all of the facts in the light most favorable to the plaintiff and considering all the claims of a due process violation as a whole, the Court cannot grant summary judgment to the defendants on the due process claims.

### a.   Bias and Impartiality

Application of the three Mathews factors for idetifying the requirements of due process establishes that a fair and impartial tribunal and trial is a necessary component of procedural due process.  The plaintiff's interest in avoiding expulsion is great, as is the benefit of an impartial panel in safeguarding against an erroneous decision. Nor does the providing of a fair and impartial tribunal impose a great administrative burden on the school.  An impartial tribunal does not turn a university disciplinary hearing into an adversarial trial-type hearing.

The plaintiff claims that several incidents in the hearing process demonstrated the panel's bias against him:  panel member Kenyatta's friendship with Wolfe, Greenstein's assertion

that a police officer would not lie, Adler's false information
regarding hospital records, and the conduct of the hearing
itself.

With respect to two of these incidents, there are
material facts in dispute.  First, although it is undisputed that
Kenyatta is a Facebook friend with Officer Wolfe, an issue of
material fact remains as to whether Kenyatta and Wolfe also knew
each other through or belonged to the same organization,
Goodfellaz.  The extent of Kenyatta and Wolfe's friendship could
impact the bias analysis.

Second, the plaintiff states, and his father testified,
that Greenstein asked during the hearing, "why would a
Philadelphia Police Officer lie?," indicating that he would
believe a police officer over a civilian solely because of his
position.  Although the hearing record does not show that
Greenstein asked this question, the testimony of the plaintiff
and his father has created an issue of material fact as to
whether this statement was made off-the-record.

The argument with respect to panel member Adler's
inaccurate assertions about the plaintiff's intoxication involves
Adler's statement that the hospital records showed that the
plaintiff tested positive for alcohol.  Adler admits that she
misread the hospital records.

There is no factual dispute about the conduct of the hearing; the Court has a written transcript.  A review of that transcript raises questions about the fairness of the hearing.  Officer Wolfe was treated with great respect by the panel.  He was allowed to give narratives of the events at issue, without any close questioning by the panel.  He was also allowed to give a speech after he came back from a break about the results of the Internal Affairs investigation of his conduct on the night in question and developments in the plaintiff's criminal matter.  When the plaintiff asked that the officer be asked whether he had come from a party on the night of the incident, the chair refused to ask the question, even though it was relevant to whether the off duty officer was under the influence of alcohol at the time of the incident.

In contrast to the way Officer Wolfe was treated, the plaintiff was aggressively cross-examined by several members of the panel.  Panel member Kenyatta had to be told by Greenstein to let the plaintiff clarify an answer.  Panel member Adler cross-examined the plaintiff very closely about what happened in the emergency room where he was taken on the night of the incident.  She also announced to the panel that the hospital records showed that the plaintiff had tested positive for alcohol when they did not.  Gumery questioned the plaintiff aggressively about why he thought that the four people confronting him were members of a

33

gang.  Both the plaintiff and his mother were told to be quiet and the plaintiff's mother was told to "shut up."

The issues with respect to bias and impartiality are the most important reasons why summary judgment cannot be granted on the due process claim.

### b.   Departures from the Code of Conduct

The plaintiff argues that the process he received departed from Temple's own Code of Conduct and, therefore, violated due process.  Significant and unfair departures from an institution's own procedures can amount to a violation of due process. See, e.g., Winnick v. Manning, 460 F.2d 545, 550 (2d Cir. 1972).

The most significant departure from the Code here is that the Review Board found a procedural defect and did not recommend a new hearing.  The Review Board found that the fact that Kenyatta and Wolfe were Facebook friends constituted a procedural defect.  The Code states that if a procedural defect is found, the Review Board will recommend that a new hearing be held before a new panel.  The Review Board instead suggested that the Code Administrator follow up on the extent of the defect.  It appears from the record that the only thing the Code Administrator did was ask Kenyatta if he was friends with Officer Wolfe.  Because the plaintiff's evidence raises a question about

the extent of the relationship between Kenyatta and Wolfe, the Court cannot say that the departure from the Code did not undermine due process.

A second potential departure from the Code of Conduct arises out of the requirement in the Code that the Vice President of Student Affairs or his or her designee who is reviewing the recommendations of the Review Board give presumptive weight to those recommendations.  In this case, the Review Board recommended that the plaintiff not be expelled and found that there was insufficient evidence of the most serious offense of acts or threats of intimidation or violence.  Although Dean Carry eventually said at his deposition that he gave presumptive weight to the recommendations of the Review Board, his testimony puts this fact in dispute.  He initially denied that the Code required that a presumption be given to the Review Board.  Only when presented with the language of the Code did he acknowledge the requirement and said that he considered it more than the panel decision.  These departures from Temple's own Code contribute to the Court's denial of summary judgment.

c.   <u>Right to Remain Silent</u>

The plaintiff claims that he was denied his Fifth Amendment right to remain silent when the hearing was held while his criminal matter was still pending.   The plaintiff did not

request a continuance of the hearing on this ground nor does the record reflect that the defendants knew about the pending criminal proceeding.  This category is a neutral factor in the Court's denial of summary judgment.

> d.   No Right to Counsel or to Cross Examine
>      Witnesses

The plaintiff claims that he was denied due process when his counsel was not allowed to participate actively in the hearing proceeding and neither he nor his counsel was allowed to cross examine witnesses.  Usually neither of these rights is considered a necessary part of due process in the student disciplinary context.  See Flaim, 418 F.3d at 640-41 (finding that counsel was unnecessary for a hearing that was not procedurally complex and that cross examination would add no value as the student had admitted his felony conviction); Newsome, 842 F.2d at 925 (concluding that the burdens of cross examination outweighed the benefits, as administrators are not well-equipped to oversee the process of cross examination); Winnick, 460 F.2d at 549 (rejecting cross examination because it is not generally considered essential for due process and would serve no useful purpose in the case at issue); but see, Gabrilowitz, 582 F.2d at 106 (requiring assistance of counsel due to potential compromise of the student's rights due to a pending criminal proceeding arising from the same events).

In this case, where the credibility of Officer Wolfe was critical and the plaintiff was claiming perjury by Officer Wolfe, counsel with the right to cross examine the witnesses would have been helpful.  It also may have removed doubts about the fairness of the hearing described above.  If an institution decides not to allow counsel or cross examination to avoid an adversarial hearing and the additional administrative burden and cost, it must make sure that the hearing it does provide is fair and impartial.  This obligation takes on more force when expulsion is the penalty.  See Goss, 419 U.S. at 584 (stating that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures."); see also, Dixon, 294 F.2d at 158 (emphasizing the seriousness of expulsion and its long term consequences in setting forth the basic requirements of notice and an opportunity to be heard).

> e.   Absence of Witnesses and Alleged Perjured Testimony

When the plaintiff learned that neither the eyewitnesses who were with Wolfe nor the officers who responded to the scene were present to testify at the hearing, he requested a continuance that was denied.  The absence of witnesses raises a question under due process because there are disputed issues of

37

material fact as to Temple's conduct in trying to get the witnesses to appear.

Segars stated that he did not receive a notice from Temple to appear at the hearing, and that if he had, he would have attended. Robinson testified that he received a phone call from Temple asking if he could attend something. When he responded that he was at work, the Temple caller said that they did not need him. The absence of Segars from the hearing becomes even more important because Dean Carry talked ex parte with Segars about the incident before the expulsion. In addition, Temple knew that the two Temple police officers could not attend the hearing and failed to inform the plaintiff.

The plaintiff also argues that he was denied due process because the panel relied on Officer Wolfe's perjured testimony. Even if Officer Wolfe had committed perjury, however, there is no evidence suggesting that the defendants knew that he had.

The plaintiff's concerns about Officer Wolfe's testimony go more to the arguments (1) that Temple should have done more to get the other witnesses to testify or should have continued the hearing, and (2) that the hearing was not conducted in a fair manner so that Officer Wolfe's credibility could be judged properly.

f.   Consideration of Evidence

The plaintiff argues that both the failure to consider certain evidence and the consideration of other evidence constitute due process violations.  The first involves Dean Carry's failure to consider the documentary evidence in making the ultimate decision to reject the recommendation of the Review Board and to expel the plaintiff.  The improper consideration of evidence involves the fact that the Panel Members received a summary of Officer Wolfe's version of events but not the plaintiff's version of events before the hearing.  Both of these situations, especially the latter, contribute to the Court's conclusion that summary judgment is not appropriate.

g.   Appeal and Process of Decision

The plaintiff claims that he could not participate in the appeal process by submitting evidence and testimony, which denied due process.  He also argues that the result of the hearing was predetermined because the matter was presented to the Full Panel, the only hearing panel that can expel a student.  The Court concludes that neither of these arguments is persuasive. First, the plaintiff participated in the appeal process beyond the extent that the Code of Conduct permitted.  The Court declines to impose more formal procedure in requiring more participation for appeals and deviate from the latitude given to

39

schools in establishing their own procedures.  Second, a
dismissal is unlikely to be predetermined if it is grounded in
cause, and the Court sees sufficient cause in the events giving
rise to the hearing to find the claim that the plaintiff's
dismissal was predetermined unconvincing.

3.  Summary Judgment as to Particular Defendants

Defendants Ann Weaver Hart, M. Moshe Parat, Jonathan
Scott, Bonita Silverman, and the Trustees of Temple University
have moved for summary judgment on the ground that they had no
involvement in the decision to expel the plaintiff or in the
process used.

The Court will grant summary judgment on the due
process claim to these certain defendants.  The plaintiff does
not oppose the motion as to the members of the Review Board,
Jonathan Scott and Bonita Silverman.  As to the Board of Trustees
of Temple University, the plaintiff bases his claim against them
on the ground that they are responsible for the contents of the
Code.  The Court has already ruled that the facial challenges to
the Code are without merit so summary judgment will be granted to
the Board of Trustees.  The Court will also grant summary
judgment to M. Moshe Parat and Anne Weaver Hart because the
plaintiff has failed to present any evidence of their roles in
the proceedings that led to the plaintiff's expulsion.

40

B.   Equal Protection

The plaintiff claims in Count III that his right to
equal protection was violated when he was subjected to different
standards than similarly situated African American students.  The
plaintiff asserts that minority students facing charges similar
to him were sent to the Conference Board, which lacks expulsion
power, rather than the Full Panel, and those who faced the Full
Panel received more lenient sanctions than the plaintiff.  The
plaintiff also claims that three individual African American
students were treated differently than the plaintiff when facing
disciplinary charges.

The Equal Protection Clause provides that no state will
"deny to any person within its jurisdiction the equal protection
of the laws."  U.S. Const. amend. XIV, § 1.  To establish a claim
under the Equal Protection Clause, a plaintiff must allege facts
to demonstrate that he received different treatment from those
similarly situated.  City of Cleburne v. Cleburne Living Center,
473 U.S. 432, 439 (1985); Keenan v. City of Philadelphia, 983
F.2d 459, 465 (3d Cir. 1992).

To support their motion for summary judgment, the
defendants present data reflecting all students subject to
disciplinary proceedings for charges similar to those faced by
the plaintiff.[16]  This summary and its supporting data show that

_____

[16]   The defendant attaches affidavits with the data supporting
the summary.  Data of Disciplinary Proceedings at Temple, Def.

Caucasian and African-American students were equally placed
before the different hearing panels.  The affidavits also show
that more African-Americans were expelled than any other group in
the 2006-2010 period.

The defendants also present evidence showing that the
individual minority students to whom the plaintiff refers were
not similarly situated to the plaintiff.  Although the plaintiff
and one of the African-American students both requested a
continuance of their proceedings, the plaintiff cites no other
similarities.  The other student requested and was granted a
continuance based on his pending criminal matter.  Pl. Exhibit
XX.  Although the plaintiff's criminal matter was also still
pending, he requested the continuance based on the
unavailability of witnesses, not his criminal matter.  Pl. Ex. D,
13.  The two other allegedly comparable African-American students
did not face charges similar to the plaintiff.  Those students
failed to attend a disciplinary hearing.  The proposed sanction
for failing to appear is a $100.00 fine.  Pl. Opp., 47.  Temple
has never disciplined a student for failing to appear as a
witness at a hearing.  Greenstein Deposition, Def. Exhibit C,
108-109.

In support of its claims, the plaintiff supplies
numbers comparing minority and white students facing similar

---

Reply, Exhibits E and F.  The defendants provided this data to
the plaintiff during discovery.

charges and their punishment; however, the origin of these numbers remains unclear, because the plaintiff does not attach affidavits confirming them.  Pl. Opp., 18-20, 29-30, 77-79.  The plaintiff also presents numbers of minority and white students facing the different hearing panels and the resulting sanctions; but again, the plaintiff has not attached affidavits in support of these numbers or provided information indicating their source. The defendants supplied the plaintiff with the same data on disciplinary proceedings at the University that they relied upon; however, the plaintiff's figures conflict with some of that data.

The Court concludes that the plaintiff failed to carry his burden to point to facts demonstrating that similarly situated African Americans were treated differently than he, and thus grants summary judgment for the defendants on the Equal Protection claim.

C.   Deprivation of Property

The plaintiff claims in Counts IV and VI that Temple withheld his transcripts and credits after his expulsion, depriving him of his property.  The plaintiff's father George Furey, however, has acknowledged receipt of several copies of his transcript.  Pl.'s Opp., Exhibit Z.  Additionally, the plaintiff acknowledged in his deposition his success in applying to and enrolling in another college since his expulsion.  Def. Exhibit

43

CC.  The Court will grant summary judgment on these claims on the
ground of mootness.


    D.  <u>Breach of Contract</u>

       The plaintiff claims in Count V that the University
breached a contract with him by depriving him of credits earned
for courses taken at Temple.

       To sustain a claim for breach of contract, a plaintiff
must prove: 1) the existence of a contract and its terms; 2) a
breach of the duty imposed by the contract; and 3) damages that
resulted.  <u>CoreStates Bank, Nat'l Ass'n v. Cutillo</u>, 723 A.2d
1053, 1058 (Pa. Super. Ct. 1999).

       Temple argues that the plaintiff has failed to show the
creation of any contract.  The Court agrees.  The plaintiff does
not point to any official materials to demonstrate the creation
of a contract between himself and the University.[17]  The Court
has already determined that the plaintiff's claim that his
transcripts and credits were withheld is moot; thus, a breach of
contract claim similarly grounded would also be moot.

_____

[17]  Some courts have found creation of a contractual
relationship in a university handbook or bulletin, but others
have cautioned against finding such a contract which is
unilaterally created by the university without bargaining.  <u>See
Slaughter v. Brigham Young University</u>, 514 F.2d 622 (10th Cir,
1975) (cautioning against rigid application of contract theory in
the relationship between students and universities); <u>Fellheimer
v. Middlebury College</u>, 869 F.Supp. 238 (D. Vt. 1994) (finding no
legal bar to a breach of contract action where the terms of a
college handbook ground the contract).

Accordingly, the Court grants summary judgment on the plaintiff's breach of contract claim.

E.    Retaliation

The plaintiff claims in Count VII that his expulsion was retaliation for a lawsuit filed against Temple Police Officers Binder and Harvey before his expulsion from the University.

In order to maintain a retaliation claim, a plaintiff must show the exercise of a constitutionally protected activity and that the activity was a substantial factor in the alleged retaliatory action.  Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005).

Temple argues that the plaintiff has failed to support its retaliation claim.  Even assuming that the filing of the lawsuit was a constitutionally protected activity, the Court agrees with the defendants.  Other than a reference to the fact that the plaintiff's expulsion came after the lawsuit was filed against the Police Officers, the plaintiff does not support or even claim that the individuals who determined that the plaintiff should be expelled were aware of the lawsuit's existence.  The Court accordingly grants summary judgment on the plaintiff's retaliation claim.

An appropriate Order will be issued separately.