IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KEVIN FUREY                     :      CIVIL ACTION
                                :
            v.                  :
                                :
TEMPLE UNIVERSITY, et al.       :      NO. 09-2474

TABLE OF CONTENTS

I.   Procedural History.. . . . . . . . . . . . . . . . . . 2

II.  Findings of Fact.. . . . . . . . . . . . . . . . . . . 3

     A.   Introduction. . . . . . . . . . . . . . . . . . . 3

     B.   Temple's Code of Conduct. . . . . . . . . . . . . 5

     C.   The Incident on April 5, 2008.. . . . . . . . . . 10

     D.   University Disciplinary Charges Against the Plaintiff
          . . . . . . . . . . . . . . . . . . . . . . . . . 11

     E.   Correspondence and Scheduling the Hearing.. . . . 13

     F.   The Hearing.. . . . . . . . . . . . . . . . . . . 18

          1.   Conflicts. . . . . . . . . . . . . . . . . . 19

          2.   The Hearing Summary. . . . . . . . . . . . . 20

          3.   Absent Witnesses and Requested Continuance.. . 21

          4.   Wolfe's Testimony . . . . . . . . . . . . . . 23

          5.   Other University Witnesses . . . . . . . . . 27

          6.   The Plaintiff's Testimony. . . . . . . . . . 27

          7.   Other Testimony for the Plaintiff. . . . . . 32

          8.   The Plaintiff's Advisors.. . . . . . . . . . 33

     G.   Panel Deliberations.. . . . . . . . . . . . . . . 34

i

H.      Rebuttal and Appeal.. . . . . . . . . . . . . .   35

       1.   The Review Board . . . . . . . . . . . .   36

       2.   Foley's Investigation. . . . . . . . . . .   37

I.      Carry's Review. . . . . . . . . . . . . . . . .   38

       1.   Meeting with Doug Segars.. . . . . . . . .   39

       2.   Carry's Decision.. . . . . . . . . . . . .   40

J.      Carry's Recommendation to Powell. . . . . . .   42

K.      Post Appeal Events. . . . . . . . . . . . . . .   43

L.      Absent Witnesses. . . . . . . . . . . . . . . .   43

M.      Other Events. . . . . . . . . . . . . . . . . .   47

III.  Conclusions of Law.. . . . . . . . . . . . . . . .   48

A.      Due Process Requirements. . . . . . . . . . .   48

B.      The Plaintiff's Challenges. . . . . . . . . . .   52

       1.   Facial Challenge to the Code.. . . . . . .   54

       2.   Departures from the Code of Conduct. . . . .   55

       3.   Failure to Provide Notice. . . . . . . . .   58

       4.   Right to Remain Silent, Cross-examine Witnesses,
          and Right to Counsel.. . . . . . . . . . .   62

          a. Right to Remain Silent. . . . . . . . . .   62

          b. Cross-Examination.. . . . . . . . . . .   62

          c. Right to Counsel. . . . . . . . . . . .   64

       5.   Absence of Witnesses and Alleged Perjured
          Testimony . . . . . . . . . . . . . . . .   67

       6.   Bias and Impartiality. . . . . . . . . . .   71

       7.   Other Issues with the Fairness of the Hearing
          Process .. . . . . . . . . . . . . . . .   73

        a.    The Hearing.. . . . . . . . . . . . .  73

        b.    The Appeal. . . . . . . . . . . . . .  76

    C.   The Plaintiff's Disciplinary Process as a Whole.. .  80

    D.   Qualified Immunity. . . . . . . . . . . . . .  85

IV.  Conclusion.. . . . . . . . . . . . . . . . . .  87

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KEVIN FUREY                    :    CIVIL ACTION
                              :
          v.                   :
                              :
TEMPLE UNIVERSITY, et al.      :    NO. 09-2474


MEMORANDUM

McLaughlin, J.                              August 3, 2012

        This suit arises from the plaintiff's expulsion from
Temple University.  The plaintiff claims that Temple University
and various Temple employees[1] violated his Fourteenth Amendment
right to procedural due process during the disciplinary process
that led to his expulsion.

        The Court held a bench trial from March 26, 2012 to
April 5, 2012 and heard the parties' closing arguments on June
21, 2012.  This memorandum and order constitutes the Court's
findings of fact and conclusions of law.  The Court finds in
favor of the plaintiff on his procedural due process claim but
finds that the individual defendants are entitled to qualified
immunity in their individual capacities.

_____

        [1] The plaintiff names as defendants: Temple University;
Temple Vice President for Student Affairs Theresa A. Powell;
Temple Vice Code Administrator Brian C. Foley; former Temple Dean
of Students Ainsley Carry; Associate Dean of Students Andrea
Seiss; Professor Richard Greenstein; former Temple Professor
Keith Gumery; Professor Diane Adler; and University Counsel
Valerie Harrison.

-1-

I.    Procedural History

        The plaintiff filed a complaint and motion for
preliminary injunction on June 2, 2009 and an amended complaint
on June 9, 2009 following his expulsion from Temple University in
May of that year.  The plaintiff alleged violations of his Due
Process and Equal Protection rights as well as breach of contract
and retaliation.  He sought reinstatement as a student at Temple
and expungement of any record of the expulsion from his college
records.

        The Court stayed the case while the parties engaged in
settlement discussions.  After those discussions were
unsuccessful, the Court considered and denied the defendants'
motion to dismiss.  The Court set an expedited discovery schedule
and a hearing.  At the close of discovery, the defendants filed a
motion for summary judgment on all claims.  The plaintiff filed a
motion for leave to file a second amended complaint alleging
several new due process violations and amending the relief
requested to include monetary damages.  This request was denied
except that the plaintiff was permitted to amend his complaint to
include a damages request for attorney fees and costs.  The
plaintiff's second amended complaint was filed on May 27, 2010.

        Following a full briefing and oral argument on the
defendants' motion for summary judgement, the Court granted
summary judgment in favor of several defendants who were not

-2-

involved in the decision to expel the plaintiff, and in favor of
the remaining defendants on all counts except the procedural due
process claim.[2]   The case was stayed again while the parties
engaged in settlement discussions.   The discussions were
unsuccessful and the Court scheduled a trial. Shortly before
trial, the plaintiff withdrew his jury demand.   An eight-day
bench trial followed.

II.   Findings of Fact[3]

    A.   Introduction

1.   In April of 2008, the plaintiff, Kevin Furey, was a full-
     time student at Temple University in the second semester of
     his sophomore year.  3/26/2012 Tr. at 27:13-15.  On May 27,
     2009, the plaintiff was expelled from Temple University.
     Ex. P-40.[4]

2.   The defendant Temple University ("Temple" or "the

--------

[2] The Temple University Review Board was inadvertently
excluded from the Court's Order on summary judgment and will be
included in the Order accompanying this Memorandum.

[3] During the bench trial in this matter, the Court reserved
rulings on the parties' objections to exhibits.  To the extent
that the Court relies in these Findings of Fact on exhibits to
which there are objections, the Court rules on those objections.
Any objections to exhibits not addressed here are denied as moot
because they were not relevant to the findings of fact in this
case.

[4] Both the plaintiff and the defendants submitted numbered
exhibits at trial.  The plaintiff's exhibits are referred to as
P-# and the defendants' exhibits are referred to as D-#.

University") is a public university and member of the Commonwealth system of education.

3.  The defendant Andrea Seiss was Temple's Associate Dean of Students and University Code Administrator for the Office of Student Conduct.  4/2/12 Tr. at 227:17-18; 4/3/12 Tr. at 39:8-19.

4.  The defendant Brian Foley was Vice Code Administrator and Program Coordinator for the Office of Student Conduct. 4/2/12 Tr. at 4:22-5:1.

5.  The defendant Valerie Harrison was Temple's Associate University Counsel. 4/4/12 Tr. at 194:7-12.

6.  The defendant Richard Greenstein was a Professor of Law at Temple's Beasley School of Law and a chair of Temple's University Disciplinary Committee.  3/30/12 Tr. at 72:4-8, 74:6-9.

7.  The defendant Keith Gumery was a professor in Temple's Department of English and the Associate Director of Temple's First Year Writing Program.  He was a vice chair of Temple's University Disciplinary Committee.  3/29/12 Tr. at 174:5-9, 281:25-282:8.

8.  The defendant Diane Adler was a retired Professor at the School of Nursing. 4/4/12 Tr. at 58:18-24.

9.  The defendant Theresa Powell was Temple's Vice President for Student Affairs. 3/30/2012 Tr. at 7:7-11.

-4-

10.  The defendant Ainsley Carry was Temple's Associate Vice
     President and Dean of Student Affairs.  3/28/2012 Tr. at
     169:4-7.

     B.   Temple's Code of Conduct

11.  Student conduct at Temple University is governed by the
     Student Code of Conduct ("the Code").[5]

12.  The Code applies to conduct within 500 yards of the
     University campus and to off-campus conduct that seriously
     threatens the safety and well being of Temple University
     students or staff or that adversely affects the University
     community.  Ex. P-68 at 1-2.

13.  The Code of Conduct lists prohibited activities and the
     possible sanctions for those activities.  One possible
     sanction is expulsion.  Id. at 5-7.

14.  The University Code Administrator oversees the University's
     judicial system.  Id. at 3.

15.  When an incident occurs that could be a violation of the
     Code, the Code Administrator determines whether to charge
     the student with Code violations.  Id. at 1, 3.

_____

     [5] During the course of this disciplinary process, the Temple
University Code of Conduct was amended.  One Code, submitted as
exhibit P-68, was in effect at the time of the incident.  Another
version, submitted at exhibit D-2, was in effect when the Hearing
and appeal in this case took place.  4/3/12 Tr. at 73:25-75:13.
Although none of the changes to the Code appear to affect this
case, the Court refers to the Code in effect at the time of each
event.

16. The Code Administrator is responsible for notifying a student charged with Code violations of the specific charges, the identity of any witnesses, and a description of any physical or documentary evidence filed with the charges. Id. at 3.

17. The Code Administrator schedules a Pre-Hearing Meeting with the charged student within five days of the student being charged.  This meeting is informal and non-adversarial so the student and the University Disciplinary Committee ("UDC") staff member can discuss the charges, the incident, the hearing procedures, and the possible sanctions.  The student must attend the Pre-Hearing Meeting and may be accompanied by an advisor in a non-active role.  Id. at 11-12, 14.

18. The student may choose to accept responsibility for the charges or continue to a hearing.  Id. at 11-12.

19. The Code Administrator determines the appropriate hearing body from among the four bodies that hear disciplinary charges.  Complex cases or cases involving severe sanctions are referred to the UDC Hearing Panel (the "Full Panel"). The Full Panel is composed of three faculty members of the UDC, one of whom is the panel chair, and two student members of the UDC.  Id. at 12.

20. A Full Panel hearing should occur thirty business days after

the Pre-Hearing Meeting, but the time limit may be extended at the Code Administrator's discretion.  Id. at 13.

21. The Full Panel, like all UDC hearing bodies, is an administrative, fact-finding panel.  Its proceedings are non-adversarial; rules of evidence, standards of proof, and other elements of court proceedings do not apply.  Id. at 2.

22. During the hearing, the University has the burden to prove that the student violated the Code of Conduct under a more likely than not standard.  Ex. D-2 at 12.

23. At the hearing, an accused student can offer testimony, witnesses, and other evidence in his own defense.  Accused students may also question testifying witnesses by posing questions through the presiding Chairperson.  Id.

24. When a student wishes to present witnesses who are members of the Temple community, the student can request that the Code Administrator's office issue notices requiring the witnesses' appearance at the hearing.  Id.

25. If evidence is presented at the hearing that was not included with the original hearing notice, the student may have time during the hearing to examine and respond to it. Id. at 13.

26. A student may have an advisor or an attorney to assist in preparing for the hearing and at the hearing itself.  The advisor or attorney plays a non-active role and cannot

-7-

question witnesses or address the panel.  <u>Id.</u>

27.  The charged student is not required to testify and the panel can draw no inference from the student's failure to testify. <u>Id.</u>

28.  All hearings are closed to the public.  The Dean of the student's school, the Dean of Students, and the Vice President for Student Affairs or her designee may attend hearings as observers.  <u>Id.</u> at 12-13.

29.  The hearing panel deliberates and determines a violation by majority vote and then recommends a sanction.  Faculty or administration officials may make recommendations to the hearing body concerning sanctions.  <u>Id.</u> at 13.

30.  When expulsion is recommended, the student can appeal the recommendation and sanction directly to the Review Board. An appeal must be filed within three days and based on: (1) availability of new evidence sufficient to alter the decision, (2) procedural defects substantially preventing a fair hearing, (3) insufficiency of the evidence to reasonably support the decision, or (4) sanctions grossly disproportionate to the offense.  <u>Id.</u> at 14.

31.  The Review Board is comprised of two students, two faculty members, and one administrator.  <u>Id.</u> at 11.

32.  If the Review Board decides that the sanctions are grossly disproportionate to the offense, then it may recommend

modified sanctions.  If a majority of the Board decides that there were procedural defects that substantially prevented a fair hearing, it will recommend a new hearing before a new panel.  If a majority of the Board decides that the decision could not have been reasonably reached from the evidence presented at the hearing, the Review Board will recommend that the original decision and/or sanctions be modified. Id. at 14-15.

33. The Review Board conveys its recommendations to the Vice President for Student Affairs.  Id. at 15.

34. The Vice President for Student Affairs, or her designee, reviews the entire record, the hearing panel's recommendation, and the Review Board's recommendation.  The Vice President for Student affairs must give presumptive weight to the Review Board's recommendations.  Id.

35. Once the Vice President for Student Affairs has made a final determination of responsibility and sanctions, the Code does not provide for further review of the decision or sanction. Id.

36. Although the Code does not provide for additional appeals, if new information is discovered after the appeals process, a student could bring that information to the Dean of Students Office or the Office of Student Affairs.  The Dean of Students and University counsel would review the material

-9-

and determine if another appeals process was appropriate. 4/3/12 Tr. at 15:10-16:8.

C.   The Incident on April 5, 2008

37.  In the early morning hours of April 5, 2008, the plaintiff was arrested following an encounter with Travis Wolfe, an off-duty Philadelphia police officer.[6]

38.  Following this incident, the plaintiff was charged by the Commonwealth of Pennsylvania with aggravated assault on a police officer.  3/26/12 Tr. at 72:20-22.

39.  The plaintiff appeared in Municipal Court before Judge Jimmie Moore for a preliminary hearing on April 15, 2008. Wolfe testified at the hearing about the events of April 5, 2008.  Ex. P-12.

40.  Judge Moore continued the case, and the plaintiff again appeared before Judge Moore on November 24, 2008.  Ex. D-82.[7]  At this hearing, the parties reached an agreement for the plaintiff to enter an Accelerated Rehabilitative Disposition ("ARD") Program in lieu of continuing

---

[6] The facts surrounding this encounter are disputed.  The Court does not need to make any findings of fact about these events in order to assess the plaintiff's procedural due process claim.

[7] The plaintiff objects to the transcript on grounds of hearsay.  The Court admits the transcript as evidence of what was said at the November 24, 2008 hearing, not for the truth of the statements made there.

prosecution.  The plaintiff read a statement that he
believed were proposed terms of the ARD agreement admitting
the truthfulness of Wolfe's testimony and apologizing.  Id.
at 22:21-24:4.  The plaintiff believed these terms could
later be negotiated.  3/28/12 Tr. at 114:7-18, 145:6-13.
The plaintiff was placed in the ARD program on June 10, 2009
at a later hearing before a different Judge.  3/28/12 Tr. at
114:11-18, 153:1-14.  The terms read at the November 28,
2008 hearing were not part of the eventual ARD agreement.
Id. at 145:6-13.

D.   University Disciplinary Charges Against the Plaintiff

41.  Seiss received a report from the Temple campus safety
services with a one paragraph description of the April 5
incident.  4/3/12 Tr. at 46:15-47:2.  That paragraph read:

> At 3:29am on Saturday April 5, 2008 PO Binder observed
> two men struggling on the ground.  As he approached the
> men, Travis Wolfe identified himself as a Philadelphia
> Police Officer.  Wolfe requested help in controlling
> the other male, Temple student Kevin Furey.  Binder
> helped Wolfe handcuff Furey.  Wolfe told Officer Binder
> that he had been in his car and observed Furey with an
> unidentified object that appeared to be a handgun.
> Furey started walking toward Wolfe.  Wolfed asked Furey
> what he had in his waistband.  Wolfe said that Furey
> removed a machete from his pants and started walking
> toward him in a threatening combat motion.  Wolfe
> removed his service handgun and showed Furey his badge
> and instructed Furey to put down the machete.  Furey
> pointed the machete to the ground but did not drop it.
> Wolfe again ordered Furey to put down the machete.
> Furey then dropped the machete.

Ex. D-3.

42.  Other than the names of witnesses to the event, this is the
     only information about the case that the Code Administrator
     received from the Campus Safety Office.

43.  Seiss determined that the incident was within the Code's
     jurisdiction because it both occurred within 500 yards of
     the University campus and might have seriously threatened
     the safety of University community members.  4/3/12 Tr. at
     76:3-13.

44.  On April 10, 2008, the Code Administrator's office sent an
     e-mail to the plaintiff's Temple University e-mail address
     with the subject line "Notice of Disciplinary Action."
     Attached to the e-mail was a one page "Charge Notice."  Ex.
     D-3; 3/28/12 Tr. at 7:15-20; 4/3/12 Tr. at 57:16-58:11.

45.  Based on the description provided in the referral, Seiss
     charged the plaintiff with three Code violations.  4/2/12
     Tr. at 221:7-10, 226:19-20.

46.  The Charge Notice stated: "You have been charged by Temple
     University with violation(s) of the following section(s) of
     the Temple University Student Code of Conduct" and included
     the full text of those sections:

         3. Any act or threat of intimidation or physical
         violence toward another person including actual or
         threatened assault or battery;
         8. The use, possession, sale or storage of articles and
         substances that endanger a person's health and/or
         safety.  This includes, but is not limited to, firearms
         (e.g. guns, pistols, rifles, stun guns, air rifles,
         pellet guns, etc.), fireworks, knives, weapons,

ammunition, gun powder, explosives, or other material
containing flammable substances, as well as replicas of
any such articles or substances.  The University will
confiscate any such articles.  Any student found in
possession of a firearm will be immediately suspended
from Temple University pending the outcome of the UDC
process;
12. Engaging in disorderly conduct.  Disorderly conduct
may include disruption of programs, classroom
activities or functions and processes of the
University.  This includes unreasonable noise, creating
a physically hazardous or physically offensive
condition; inciting or participating in a riot or group
disruption; failing to leave the scene of a riot or
group disruption when instructed by officials.

Ex. D-3.

47. The Charge Notice also included a web site where the student
could access the Student Code of Conduct online. Ex. D-3.

48. In addition, the Charge Notice contained a copy of the
paragraph reproduced at Finding of Fact 41 upon which Seiss
based the charges.  4/3/12 Tr. at 46:15-47:2.

49. Finally, the Charge Notice also instructed the plaintiff to
schedule a Pre-Hearing Meeting with the University Code
Administrator within five days.  Ex. D-3.

E.   Correspondence and Scheduling the Hearing

50. The plaintiff forwarded the notice to his mother, Margaret
Boyce Furey, Esq., who acted as his attorney.  3/28/12 Tr.
at 8:8-9.

51. Boyce Furey responded to Seiss in a letter dated April 16,
2008, describing the plaintiff's version of the incident and
requesting a Pre-Hearing Meeting after he finished classes

-13-

on May 5, 2008.  Ex. D-4.

52.  Because the April 16 letter was written by an attorney,
     Seiss forwarded a copy of the letter to University Counsel
     Harrison.  4/3/12 Tr. at 9:3-21.

53.  The Pre-Hearing Meeting was not scheduled at that time and
     no further action was taken by any party until the fall of
     2008.

54.  In April of 2008, the plaintiff had not enrolled in any
     courses for the fall 2008 semester.  Because Temple does not
     schedule a hearing when a student is not registered for
     classes, a "hold" was placed on the plaintiff's student
     account.  The hold was removed in the summer of 2008 when
     the plaintiff attempted to register for classes for the fall
     of 2008 and the parties attempted to schedule a hearing.
     4/2/12 Tr. at 173:14-175:15, 285:12-286:16.

55.  During the fall of 2008 and the spring of 2009, Boyce Furey,
     Seiss, and Harrison attempted through phone calls, e-mails,
     and letters to schedule both the Pre-Hearing Meeting and
     Hearing.

56.  A Pre-Hearing Meeting was held on December 15, 2008.  The
     plaintiff, Boyce Furey, Seiss, and Harrison attended. 4/3/12
     Tr. at 36:3-6, 70:17-21.

57.  During the correspondence, Boyce Furey requested notice of
     the charges against the plaintiff, a summary of the evidence

supporting the charges, a copy of the disciplinary hearing procedures, and a Copy of the Code of Conduct.  Exs. D-5; D-18.

58.  This information had been provided in the Charge Notice sent to the plaintiff, but it was not re-sent to Boyce Furey.

59.  Boyce Furey also requested that the Temple police officers who were present on April 5 attend the disciplinary hearing. Ex. D-18.

60.  Seiss sent the plaintiff a list of all of the witnesses the University intended to call to the Hearing.  Officer Wolfe and all four Temple University officers who were present on April 5 were included on this list.  Exs. D-13; D-30.

61.  Boyce Furey also requested that Temple provide her with the names and addresses of the individuals accompanying Wolfe on April 5.  Exs. D-18; D-19; D-21; D-24; D-28; D-33.

62.  Seiss contacted Ed Woltemate with the Temple Police department to request information about the individuals with Wolfe on the night of the incident. 4/3/12 Tr. at 106:10-107:12; Ex. D-35.

63.  Woltemate provided Seiss with three names: Steve Robinson, Douglas Segars, Colin Anderson.  Colin Anderson and Douglas Segars were both students at Temple University.  Exs. D-36; D-37.

64.  Seiss and Harrison sent the plaintiff and Boyce Furey the

names of these individuals but not their contact information.  Exs. D-22; D-27; 4/2/12 Tr. at 267:12-23; 4/4/12 Tr. at 144:12-17.  Seiss informed the plaintiff and Boyce Furey that the University would contact these witnesses about the Hearing.  Ex. D-22.

65. The Hearing date was rescheduled on several occasions, including once by Seiss when one of the student witnesses reported to her that he would be unable to attend, twice at Boyce Furey's request because a Pre-Hearing Meeting had not been held, and once to accommodate Boyce Furey's schedule. Exs. D-14; D-18; D-23; D-29; D-32.

66. A Hearing was scheduled for March 25, 2009 before a Full Panel.  Seiss informed the plaintiff that Professor Greenstein would act as Chair of the Panel.  4/3/12 Tr. at 47:3-7; Ex. D-34.

67. Boyce Furey included Greenstein as a recipient on several letters sent to University officials.  Greenstein read one of the letters and did not open or read the rest.  From the letter he read, he was aware both that the plaintiff's case involved an attorney advisor and there were continuances in scheduling the Hearing.  3/30/12 Tr. at 114:19-25, 212:6-15, 213:13-17.

68. Shortly before the Hearing, Brian Foley became the Code Administrator for the plaintiff's case.  4/3/12 Tr. at

87:23-88:4.

69. Neither Seiss nor Foley discussed the substance of the matter with any of the Panel members, including Greenstein. 4/2/12 Tr. at 89:18-90:5, 299:15-300:13.

70. Foley sent University notifications about the Hearing by e-mail to Temple students Segars and Anderson.  Exs. D-48, D-49.  Neither responded to the notifications.

71. Seiss had sent university notification by e-mail to Anderson and Segars informing them of an earlier hearing that was later rescheduled.  Exs. D-22; D-44A.  In response to this notice Segars wrote an e-mail saying, "I don't want to be a witness or involved in the case."  Ex. D-45A; 3/27/12 Tr. at 41:7-10.  Seiss responded to this e-mail urging him to speak with her about the case and Segars was notified of the cancellation and rescheduling of this hearing.  Ex. D-47A.

72. Foley informed Robinson about the Hearing by telephone. During a two to three minute phone call, Robinson informed Foley that he was in a police academy and would not be able to attend.[8]  4/2/12 Tr. at 44:24-45:15; 46:17-22.

_____

[8] Robinson testified at trial that he could not recall whether he was contacted about the Temple disciplinary hearing. 3/27/12 Tr. at 197:21-25; 211:13-15; 220:10-16.  He recalled receiving two phone calls about hearings regarding the April 5, 2008 incident.  He does not remember anything about one of the calls.  Id. at 220:17-221:3.  He recalls that during the other call, he was told that he did not need to attend a hearing if he was able to answer several questions about the incident in a phone interview.  Id. at 220:19-25.  A report of a telephone interview of Robinson conducted by Philadelphia Police Lt.

73.  Foley also contacted Woltemate to inform him that Officers
     Wolfe, Binder, Crawford, Harvey, and Sargent McGuire were
     needed for the hearing on March 25, 2009.  Exs. D-39; D-40.

74.  The day before the Hearing, Woltemate informed Foley that
     Binder and Harvey would not be able to attend because of an
     illness and a family obligation, respectively.  4/2/12 Tr.
     at 43:1-13, 196:21-197:4; Ex. D-42.  Woltemate also wrote,
     "Sgt. McGuire and P/O Crawford will attend.  P/O Wolfe (City
     PD) was notified and confirmed his attendance.  This should
     be enough.  Let's just get this one done already."  Ex. D-42.

75.  The plaintiff was not informed prior to the Hearing that any
     witnesses would not be attending.  4/2/12 Tr. at 46:23-25;
     58:12-21.

     F.   The Hearing[9]

76.  A disciplinary hearing was held on March 25, 2009 at Temple
     University.  The Panel contained three University
     professors, Richard Greenstein, Keith Gumery, and Diane
     Adler, and two Temple students, Lisa Krestynick, and Malcolm
     Kenyatta.  Professor Greenstein served as Chair of the

_____

Saggese was provided to the Court.  Ex. D-73.  Foley did not
recall telling Robinson he was not needed for the Temple Hearing.
4/2/12 Tr. at 52:14-53:3.  Given the lack of testimony on the
issue, the Court makes no finding about whether Robinson was told
that he did not need to attend the Temple disciplinary Hearing.

     [9] An undisputed transcript of the Hearing is contained in
evidence.  Ex. P-23.

Panel.

77. Brian Foley acted as Code Administrator for the Hearing.

78. The plaintiff attended the Hearing along with his parents, Boyce Furey and Mr. George Furey, who were acting as his advisors.

79. Seiss and Harrison both attended the Hearing as observers and because of their past involvement with the case.  4/2/19 Tr. at 10:17-24; 4/4/12 Tr. at 114:1-18.  Harrison attends two to three hearings a year.  4/4/12 Tr. at 183:9-20.

80. Temple University presented as witnesses Philadelphia Police Officer Wolfe, Temple Police Officer Crawford, and Temple Police Sergeant McGuire.  In addition to his own testimony, the plaintiff also presented testimony by Temple students John Fischer, Brian Bariden, and Andrew Haff.  George Furey and Boyce Furey also testified.

81. The plaintiff questioned the witnesses he presented and also submitted exhibits to the Panel.

82. The Hearing was transcribed by a court reporter at the request of the plaintiff and his advisors.[10]  Ex. P-23; 3/28/12 Tr. at 101:1-7.

    1.  Conflicts

83. At the start of the Hearing, Foley asked if any Panel member

---

    [10] Following University practice, an audio recording of the Hearing was also made.  Neither party wished to submit this recording to the Court.  3/29/12 Tr. at 131:1-132:8.

felt he or she could not be fair or impartial.  All
responded that they did not.  P-23 at 9:11-15.

84. Panels members are trained to inform the code administrator
or hearing chair if they recognize any of the participants
in a hearing, in order to assess whether they could be
impartial.  4/3/12 Tr. at 51:5-52:16.

       2.  <u>The Hearing Summary</u>

85. Prior to the date of the Hearing, the Panel members did not
know anything about the case they were about to hear.  4/4/12
Tr. at 64:10-11.

86. At the start of the Hearing, the Panel members were provided
with a one-page "Hearing Summary."  This document lists the
date and time of the Hearing, the Code violations alleged,
the names of the University witnesses, and the names of the
Panel members.  Ex. P-25.

87. The Hearing Summary did not list witnesses requested by the
plaintiff.  Ex. P-25; 4/2/12 Tr. at 218:3-19.  The witnesses
listed were Officer Travis Wolfe, Sergeant Kenneth McGuire,
Officer Carl Binder, Officer Crawford, and Officer Harvey.
P-25.

88. The Hearing Summary also included a paragraph entitled
"Specifications" which is identical to the "Specifications"
paragraph in the Charge Notice, quoted in Finding of Fact
41.  Exs. P-25; D-3.

89.  In introductory remarks at the Hearing, Greenstein explained
     that "The information that's set out in the Specifications
     on that sheet in front of you is for the purpose of making
     clear to you and to the Panel what the hearing is about, but
     that's not the evidence."  P-23 at 15:13-21.

90.  The plaintiff received a copy of the Hearing Summary at the
     start of the Hearing.[11]

91.  The plaintiff was not able to submit his version of events
     to the Panel to contradict the description in the Hearing
     Summary.  No opening statements were made at the Hearing.
     The plaintiff's first opportunity to present his version of
     the events of the incident was during his testimony, after
     the University witnesses testified.

          3.  <u>Absent Witnesses and Requested Continuance</u>

92.  The following witnesses did not appear for the Hearing:
     Officer Binder, Officer Harvey, Steve Robinson, Douglas
     Segars, and Colin Anderson.

93.  Upon learning that morning that the witnesses he requested

---

[11] The plaintiff and George Furey testified at trial that
the plaintiff never received a copy of the Hearing Summary nor
was he made aware that the Panel received copies of it.  3/26/12
Tr. at 126:2-7, 130:10-18; 3/29/12 Tr. at 9:23-10:13.  But at the
Hearing, Foley and Greenstein both referenced the document in
their introductory remarks.  Ex. P-23 at 8:9-22, 15:14-17.  The
plaintiff was asked by Foley if he had "received the
specifications of the matter which are on the Summary Sheet in
front of you?"  The plaintiff responded, "Yes."  Ex. P-23 at
8:19-23.

would not be in attendance, the plaintiff requested that the Hearing be continued until all of the witnesses were present.  Ex. P-23 at 13:10-13; 3/26/12 Tr. at 122:7-13.

94.  In response to the plaintiff's request, Greenstein stated that the Hearing would go forward, but the plaintiff would have an opportunity to describe what he believed the witnesses would have added and the Panel would take that information into consideration.  Ex. P-23 at 13:14-24.

95.  The decision to delay a hearing is the responsibility of the Code Administrator.  3/30/12 Tr. at 96:21-97:5.  Once a hearing has begun, the Chair does not have the authority to grant a continuance.  Id. at 96:13-97:1; 4/2/12 Tr. at 50:18-51:10.  The Panel can only consider the effect of absent witnesses on its determination.  3/30/12 Tr. at 96:13-20.

96.  Neither Seiss nor Foley discussed the possibility of postponing the Hearing because of absent witnesses.  3/30/12 Tr. at 99:24-100:7; 4/2/12 Tr. at 50:18-51:10; 289:20-290:3.

97.  The notices of the Hearing date and time that were sent to both Segars and Anderson informed them that failure to attend a disciplinary hearing will result in a charge for a Code violation.  Exs. D-48, D-49.

98.  Although this warning was included, the University usually charges this Code violation only when a complaining witness

or the accused student fails to appear.  4/2/12 Tr. at 30:5-15; 4/3/12 Tr. at 87:5-18.  In consultation with Harrison, Seiss decided not to charge either student with a violation of the Code.  4/4/12 Tr. at 154:19-155:4.

99. Other than this threat of sanction, the Code Administrator does not have the ability to compel witnesses to attend the disciplinary hearing.  4/2/12 Tr. at 271:23-25.

### 4.   Wolfe's Testimony

100. Wolfe was the first witness to testify at the Hearing.[12]  In a mainly uninterrupted statement, Wolfe described his version of the events of April 5, 2008:  He was driving on Monument Street when he saw the plaintiff walking along the road and yelling loudly.  The plaintiff retrieved what Wolfe suspected was a gun from the trunk of his car.  Concerned for the safety of a crowded block of students leaving a party on the street, Wolfe asked the plaintiff what he had.  In response, the plaintiff pulled a machete from his waistband, lifted it above his head and charged, in a combat manner, towards Wolfe's car.  Wolfe got out, drew his gun, identified himself as a police officer, showed his badge, and told the plaintiff to drop the knife.  The plaintiff

---

[12] The Court describes the testimony given to the Panel for the purpose of analyzing the due process claim.  The Court makes no factual findings about the events of April 5, 2008, which are outside the scope of this lawsuit.

stopped moving but did not drop the machete.  After being
told to drop the machete several times, the plaintiff
complied.  Wolfe attempted to restrain the plaintiff.  The
plaintiff resisted, and the two were wrestling on the ground
when a Temple police officer arrived and helped handcuff the
plaintiff.  Wolfe also told the Panel that the plaintiff
appeared to be drunk.  Ex. P-23 at 19-23.

101. Wolfe was then questioned by individual Panel members who
asked him to explain or expand upon details of his
narrative.  Id. at 23-35.

102. The Chair asked the plaintiff if he had any questions for
Wolfe.  Id. at 35:22-25.  The plaintiff requested a number
of questions be posed to Wolfe.  Id. at 35-50.

103. The Chair posed many of these questions to Wolfe.  For some
of the questions, Greenstein asked the plaintiff to explain
the relevance of the question before asking the question.
Id. at 80:10-22, 82:2-19, 94:6-11; 100:7-17.

104. Greenstein refused to ask some of the plaintiff's proposed
questions, including how many people were with him on April
5, why the Police report differed from his testimony at the
Hearing, about a paper he had written entitled "Media in my
Childhood," about discrepancies with prior testimony, if
Wolfe was on probation with the police department, and
questions about his attendance at parties with Temple

-24-

students.  Id. at 48:17-49:12, 49:17-23; 79:5-7, 80:6-81:2,
84:8-12; 99:6-10.

105. The plaintiff provided the Panel with a transcript of
Wolfe's testimony from the April 15, 2008 preliminary
hearing and a police report from April 5, 2008 in order to
demonstrate inconsistences in Wolfe's description of events.
Id. at 51, 58.

106. The Panel took two breaks, one break to make copies of the
preliminary hearing transcript, and a second break to review
the transcript.  Id. at 51:11-19; 67:18-68:1.

107. These breaks were not taken because Officer Wolfe became
flustered and unable to answer questions.[13]

108. During the first break, Officer Wolfe made a phone call
outside of the Hearing room.  3/29/12 Tr. at 20:25-21:6.

109. After returning from the first break, before the Panel
reviewed the transcript, Wolfe was given permission to read
a written statement into the record.  Id.

110. In this statement, Wolfe testified to the consistency of his
testimony in other proceedings, stating "as you will see
from any document that . . . may be produced from anywhere,
will always be accurate, will be accurate from my testimony

---

[13] The plaintiff testified at trial that Greenstein took a
break when Wolfe became flustered and unable to answer questions.
3/26/12 Tr. at 90:19-91:3.  The transcript shows that no
questions were posed to Wolfe immediately prior to either break.
Ex. P-23 at 51, 67.

today, they'll be the same."  P-23 at 53:2-6.  He stated

that he, Wolfe, had been exonerated by an internal affairs

investigation of any wrong doing related to this matter.[14]

Id. at 55:3-5.  He also told the Panel that the plaintiff

had stated in court "that his actions were wrong, and the

Officer, myself, acted reasonable and just and my actions

were –- were right.  And he also apologized on record to the

Court in front of Honorable Judge Moore."  Id. at 55:10-16.

Wolfe concluded his statement by saying that it has been the

practice of the plaintiff and his attorney to make a mockery

of this and other proceedings and make ludicrous allegations

against him.  Id. at 55:17-56:7.

111.  The plaintiff objected to this statement and pointed out to

the panel that Officer Wolfe had been on the phone prior to

making this statement.  Id. at 57:12-17.  Later he asked

---

[14] In fact, in a memorandum to the Police Commissioner dated
February 27, 2009, Philadelphia Police Lt. Saggese of the
Internal Affairs Division reported on his investigation of the
incident and concluded that on April 5, 2008, Wolfe violated
Police Department policy "in several ways," although was
exonerated of an allegation of excessive force against the
plaintiff.  Ex. P-18 at 7.  Saggese concluded that Wolfe's
decision to address the plaintiff, who was not confronting or
fighting with anyone, "not only endangered himself, because he
was off-duty, in plainclothes at 3:00 a.m., he also placed his
passengers in danger by stopping, getting out of his car, and
leaving them."  Saggese wrote further, "Officer Wolfe's actions
or his presumption of imminent danger were unfounded or a figment
of his imagination up to that point.  It was not until he
confronted Mr. Furey did the incident escalate into a
confrontation."  Id.  Neither the plaintiff nor the Panel had a
copy of this memorandum.

Greenstein to determine to whom Wolfe had spoken on the phone.  Greenstein refused to inquire, stating that it was not relevant to the Hearing.  Id. at 100:3-17.

     5.   Other University Witnesses

112. The University also presented the testimony of Officer Crawford and Sergeant McGuire of the Temple Police Department.

113. Both told the Panel they arrived at the scene of the incident after the plaintiff was handcuffed.  Id. at 106:12-14, 119:7-11.

114. Crawford testified that he was alerted to the incident by a radio call by Temple police officer Binder about a fight on Monument Street.  Id. at 101:11-15.

115. Both officers testified that the plaintiff was yelling obscenities and refusing to get in the marked Temple police car.  Id. at 101:21-24, 120:12-22.

116. Crawford testified that he observed the machete on the ground near the plaintiff's car.  Id. 107:24-108:11.

117. McGuire testified that the plaintiff appeared to be intoxicated.  Id. at 120:2-11.

     6.   The Plaintiff's Testimony

118. At the start of the Hearing, Greenstein told the plaintiff "You may also testify on your own behalf, but I want to make

very clear, that you are not required to testify at this
hearing." <u>Id.</u> at 17:16-19.

119. The plaintiff testified on his own behalf at the Hearing.

120. The plaintiff told the Panel his version of events: On April
4, 2008, he went to a party with two friends, where he did
not drink heavily.  Around midnight or 12:30 in the morning
of April 5, the plaintiff and several friends left the party
and went to Jon Fischer's house on Monument Street, where
they spent several hours watching television.  Around 3:00
a.m or 3:30 a.m., Fischer realized he had locked his keys in
his bedroom, along with his credit cards and cell phone.
Hoping to pry open the door, the plaintiff went to his car
on Monument Street to retrieve a machete he had in his trunk
for yard work.  The plaintiff was at the trunk of his car
when he was approached by five people on foot.  One asked
him what he had.  He responded that it was none of their
business.  Wolfe then drew a gun and pointed it at the
plaintiff.  The other individuals stated "he's a cop" and
then Wolfe said "I'm a cop."  He did not show the plaintiff
a badge, and the plaintiff thought he was being mugged.  The
other individuals started saying "shoot him, shoot him."
The plaintiff dropped the machete.  Wolfe tackled him and
the others ran over and began kicking him.  He lost
consciousness from his heading hitting the pavement.  Temple

police officers arrived and helped handcuff the plaintiff.
His knees were injured when the Temple police officers
dropped him while he was handcuffed.  He did not yell at the
officers.  He was taken to the 22nd District where he waited
in the parking lot for over half an hour before being taken
to Hahnemann Hospital for about ten hours and then back to
the police station.  Id. at 134-142.

121. The plaintiff was then questioned by each of the Panel
members.

122. Greenstein did not remark "Why would a Philadelphia police
officer lie?"[15]  3/29/12 Tr. at 298:25-299:4; 3/30/12 Tr. at
179:24-180:3; 4/2/12 Tr. at 181:11-23; 4/3/12 Tr. at 123:24-
124:3.  While questioning the plaintiff, Greenstein did ask
several questions about the plaintiff's understanding of
Wolfe's motivation that evening, stating, "I'm trying to
understand why a Philadelphia Police Officer would want to
attack you for money." and "I'm just trying to understand
why he would have done what you're saying he did."  Ex. P-23
at 148:14-150:8.

123. During his questioning, Kenyatta had to be told by

_____

[15] George Furey testified at trial to having heard
Greenstein ask this question during a Hearing break.  3/29/12 Tr.
at 18:8-12.  The Court does not doubt the sincerity of George
Furey's testimony, but finds the testimony of other witnesses who
did not hear this remark equally credible.  The Court also notes
that Greenstein did pose questions to the plaintiff about Wolfe's
possible motivation to approach and attack him.

Greenstein to allow the plaintiff to complete his answer before asking another question.  Id. at 159:9-14.

124. Adler questioned the plaintiff about the amount of alcohol he had consumed prior to the incident and about the length of time he was at Hahnemann Hospital and the scope of treatment he received.  Id. at 166-175; 183-185.

125. During questioning, Adler stated, "according to the record you provided, you tested positive for alcohol.  They put positive ETOH, which means you smelled like alcohol when you went to the hospital."  Id. at 183:19-22.  Adler repeated this comment, stating "And the person who admitted you said . . . positive for alcohol, which meant you smelled of it . . . ."  Id. at 184:14-18.  Adler made these statements on the basis of the Hahnemann Hospital record from April 5, 2008.[16]  Ex. D-84; 4/3/12 Tr. at 213:12-15, 215:11-17.

126. Other Panel members heard Adler's statement.  3/29/12 Tr. at 307:3-15; 3/30/12 Tr. at 156:1-2.

127. By "tested positive," Adler meant a "nose test."  The designation "positive ETOH" meant that the hospital staff smelled alcohol.  4/3/12 Tr. at 213:12-15, 215:11-17.  The

---

[16] During her deposition, Adler testified that her comment during the Hearing was in error, because the "positive ETOH" designation was contained in a description of the plaintiff's social history.  At trial, Adler explained that the designation actually appeared in both the social history and physician's report, and thus her statement at the Hearing had been correct. 4/3/12 Tr. at 213:19-214:8; 4/4/12 Tr. at 67:22-68:8.

-30-

term does not mean inebriated or intoxicated.  4/4/12 Tr. at
73:2-5.

128. When the plaintiff tried to dispute that the hospital staff
detected alcohol, the following exchange occurred between
Adler and the plaintiff:

> Q: Not everybody can be lying and, you know, be wrong.
> A: I mean, I've heard of conspiracies before and
> several people are lying, so.
> Q: Hillary heard of conspiracies too.

Ex. P-23 at 185:2-6.

129. During a break, George Furey overheard Adler say "This
wasn't supposed to take this long."[17]  3/29/12 Tr. at 17:13-
16.

130. Gumery questioned the plaintiff about his statement that he
believed he was being approached by a "gang" on April 5.
The following exchange occurred:

> Q: Could you define a gang for me; what you believe a
> gang to be?
> A: A group of criminals with the same allegiance and
> same mind set.  That's the type of gang I'm talking
> about.  Not our gang, not a T.V. show. People --
> Q: So if they were a group of friends who'd been to a
> club and were wearing board shorts and Hawaiian shirts,
> you would see them -- and there were more than five of
> them, you would see those as being a gang?
> A: I mean potentially-

P-23 at 180:16-181:3.

131. Boyce Furey objected to this line of questioning as

---

[17] Adler testified that she did not recall making this
statement.  4/3/12 Tr. at 194:21-23.  The Court has no reason to
doubt George Furey's testimony.

argumentative.  Gumery responded to her, "Shut up, please."
Id. at 181:4-6.

132. At the end of the Hearing, Greenstein asked the plaintiff
what testimony he expected from the witnesses who did not
appear at the Hearing.  Id. at 234:11-13.

133. The plaintiff responded "I mean, I wanted Colin Anderson, I
wanted the people who he alleges . . . were in the car."
Gumery interrupted the plaintiff's next answer, leading to
this exchange:

> MR: GUMERY: I'm sorry, can I just ask, you just said
> they were in the car?
> MR. FUREY: Allegedly in the car, I --
> MR. GUMERY: No, you said they were in the car, right?
> MR. FUREY: Alleged.  According to Officer Wolfe --
> MR. GUMERY: No, but you said --
> MR. FUREY: –they were in the car.
> MR. GUMERY: You just said --
> MS. BOYCE-FUREY: You're arguing with my son.
> MR. FUREY: This is –- I've been --
> MS. BOYCE-FUREY: He's saying –- what he said is true.
> MR. GUMERY: No, I'm just -- I want to check.

Id. at 234:14-235:22.

134. Professor Greenstein asked the plaintiff what he wanted to
elicit from the absent witnesses.  The plaintiff responded
that he wanted to establish the character of the other
people with Wolfe on April 5, 2008.  Id. at 236:15-237:1.

        7.   Other Testimony for the Plaintiff

134. Three Temple students, Jon Fischer, Brian Bariden, and
Andrew Haff testified on behalf of the plaintiff.  Although

all three had been with the plaintiff on April 4, none of
them were present on Monument Street when the incident
occurred.

135. George Furey corroborated his son's testimony that the
machete was a gardening tool he had purchased for yard work.
He showed the Panel pictures of his home where the machete
was used.  He also provided the Panel with exhibits gathered
from Facebook.com showing Wolfe in plain clothes and at
parties.  Id. at 222-26.

### 8.  The Plaintiff's Advisors

136. At the start of the Hearing, the plaintiff introduced his
advisors.  Foley informed everyone that "the role of the
advisor is to advise the student charged.  The advisor is
not permitted to question witnesses directly, or address the
panel."  Id. at 9:16-10:6.

137. Boyce Furey addressed the Panel throughout the Hearing,
including objecting to the Chair's decisions and answering
questions posed to the plaintiff.  See, e.g., id. at 12:9-
10, 38:11-15, 43:12-14.  Boyce Furey also questioned the
plaintiff during his testimony to the Panel.  See, e.g., id.
at 136:2-3, 137:24-138:1.  She was told by the Chair and
other Panel members not to address the Panel and allow the
plaintiff to speak for himself.  See, e.g., id. at 43:24-
44:9, 54:2-7; 237:5-12.

-33-

138. During the Hearing, members of the Panel told the plaintiff
that his conversations with his advisors were too loud and
distracting from witness testimony.  See, e.g., id. at
21:11-19, 36:11-12; 3/28/12 Tr. at 87:14-19; 3/29/12 Tr. at
15:2-12.

    G.   Panel Deliberations

139. The Panel conducted its deliberation in two parts:
responsibility and sanctions.

140. During both parts, Foley attended the Panel's deliberations,
but did not have a vote in either phase.  Ex. P-23 at
237:23-238:3; 3/29/12 Tr. at 257:21-258:1; 3/30/12 Tr. at
217:7-8; 4/2/12 Tr. at 117:12-17.

141. At the start of deliberations on sanctions, Foley reminded
the Panel members to focus on the evidence presented at the
hearing, not the conduct of the Hearing itself.  4/2/12 Tr.
at 120:8-25.

142. The Panel reached a unanimous decision that it was more
likely than not that the plaintiff had violated each of the
charged sections of the Code of Conduct.  Exs. P-23 at
238:7-23; D-58.

143. During deliberation on sanctions, the Panel determined that
it could consider the plaintiff's demeanor at the Hearing in
recommending a sanction.  3/29/12 Tr. at 304:11-21; 3/30/12
Tr. at  242:14-243:12.

144. When asked, Foley informed the Panel that in past cases, when violation occurred involving a weapon and a conflict with a police officer, the sanction was usually expulsion. 4/2/12 Tr. at 119:13-18; 4/4/12 Tr. at 22:16-24.

145. The Panel unanimously recommended immediate expulsion.  Exs. P-23 at 243:3-10; D-58.

146. Wolfe was among those in the Hearing room at the time the Panel announced its sanction recommendation.  3/27/12 Tr. at 32:4-24; 3/30/12 Tr. at 218:22-24; 4/2/12 Tr. at 186:18-22.

147. The Panel deliberated for approximately twenty minutes on the issue of responsibility and approximately ten minutes on the issue of sanctions.[18]

H.   Rebuttal and Appeal

148. After the Hearing, the plaintiff submitted a letter of rebuttal and appeal and two addendums to that letter.  The letter and addendums listed twenty seven grounds for the rebuttal and appeal and included several attachments.  Exs. P-33; P-34; P-35.

---

[18] At trial, there was differing testimony about the length of time the Panel deliberated on each part.  The plaintiff testified that the Panel did not deliberate for very long on responsibility, and for only two minutes on sanctions.  3/27/12 Tr. at 26:13-25.  Greenstein testified that deliberation on responsibility lasted for about half an hour, and the sanctions deliberation lasted something less than that.  3/30/12 Tr. at 210:9-25.  Foley testified that the Panel deliberated for twenty to thirty minutes on responsibility and for ten to fifteen on sanctions.  4/2/12 Tr. at 192:10-193:1.

149. One attachment to the second addendum was a report from Dr. Alfred Sacchetti stating that there was no evidence in the plaintiff's medical records from April 5, 2008 that he had been using alcohol immediately prior to his hospital visit that morning.  Ex. P-35.

150. The second attachment to the second addendum was a screen capture from Facebook.com showing that Malcolm Kenyatta and Travis Wolfe were "Friends."  Id.

151. The letters of rebuttal and the exhibits from the Hearing were sent to the Review Board.  The Review Board was also given access to the audio recording of the Hearing through Temple University's "Blackboard" website.  3/28/12 Tr. at 239:3-18; 4/2/12 Tr. at 155:17-156:2.

       1.    The Review Board

152. Members of the Review Board independently reviewed the appeals materials, including the audio recording of the Hearing, and then met to discuss the case.  Ex. P-52 (Scott Dep.)[19] at 12:5-11, 13:2-5.

153. The Review Board considered each of the numbered reasons for appeal in the plaintiff's letters.  Id. at 14:11-13.

154. The Review Board found no basis for appeal on twenty-four of

---

[19] Professor Jonathan Scott was a member of the Review Board.  P-52 (Scott Dep.) at 11:15-18.  Scott's deposition was submitted to the Court in lieu of trial testimony.  4/3/12 Tr. at 283:15-284:1.

the twenty-seven grounds the plaintiff listed.  Ex. P-39.

155. On three grounds, the Review Board determined there was a basis for appeal.  Id.

156. First, the Review Board recommended, "that there was not sufficient evidence to find Kevin Furey responsible for violating section 3 of the Student Code of Conduct."  Id. Section 3, set out in Finding of Fact 46, dealt with intimidation, physical violence, and actual or threatened assault and battery.

157. Second, the Review Board recommended that the sanction was disproportionate to the violation.  The Review Board recommended suspension rather than expulsion.  Id.

158. Finally, the Review Board recommended that a procedural defect occurred when a Hearing Panel member was a Facebook friend with a principal witnesses.  The Review Board recommended that the Code Administrator investigate this issue further, but did not recommend a new hearing.  Ex. P-39.

159. The Review Panel reported their recommendations to Foley.

2.   Foley's Investigation

160. Foley investigated the Facebook friend issue by meeting with Kenyatta.  4/2/12 Tr. at 107:12-17.

161. During a five to ten minute meeting, Kenyatta informed Foley that he was not aware of the Facebook friendship until that

-37-

meeting and that he did not know Wolfe.  4/2/12 Tr. at 107:17-108:7, 109:15-110:2, 111:2-5; 4/4/12 Tr. at 253:13-15, 254:8-21.

162. Kenyatta did not have a personal relationship with Wolfe. At the time of the hearing, Kenyatta had over one thousand Facebook "friends" and used the website to publicize events he participated in at Temple.  4/4/12 Tr. at 254:19-24.

I.  Carry's Review

163. Carry was Powell's designee for the purpose of reviewing disciplinary appeals.  3/28/12 Tr. at 235:23-24.

164. Carry first learned of the incident on April 5, 2008, shortly after it occurred, when he received a copy of the report generated by the campus safety department.  3/28/12 Tr. at 179:13-22.  Over the course of the disciplinary process, the Code Administrator's office kept him informed about the progress of the case.  3/28/12 Tr. at 180:16-182:14.

165. Foley compiled the Review Panel's recommendation, the plaintiff's letters of rebuttal and appeal, and the documents from the Hearing.  He gave this information to Powell and Carry.  3/28/12 Tr. at 239:18-21; 3/30/12 Tr. at 7:7-11.

166. Foley and Carry met for approximately fifteen to twenty minutes to discuss the case, the Review Board's

-38-

recommendation, and Foley's investigation.  3/28/12 Tr. at
244:7-246:19; 4/2/12 Tr. at 113:3-12, 156:21-157:11.

167. Foley was not asked for his recommendation on the resolution
of the case, and he did not offer a recommendation. 4/2/12
Tr. at 157:12-16.

    1.   <u>Meeting with Doug Segars</u>

168. In April of 2009, Carry met with Doug Segars, one of the
Temple students with Wolfe on the night of the incident.[20]
Segars did not attend the Hearing.  3/27/12 Tr. at 137:2-15.

169. Carry and Segars met for approximately twenty minutes to
half an hour in Carry's office.  3/27/12 Tr. at 137:16-22.

170. At the start of the meeting, Carry asked Segars what
happened on April 5, 2008 and Segars described the events
from his point of view.  3/27/12 Tr. at 137:7-15.[21]

171. The two also discussed Segars's academic major.  3/27/12 Tr.

---

[20] In his deposition, Carry testified that he met with
Segars at Segars's request, following a newspaper story about the
case and to discuss his major. Ex. P-47 (Carry Dep.) at 163:2-7.
At trial, Carry testified that he reached out to Segars after
Segars's mother contacted the University, concerned about her
communication with Boyce Furey related to the case.  3/28/12 Tr.
at 170:18-24.  The Court does not need to resolve the reason
prompting this meeting, but notes this discrepancy in its
assessment of Carry's credibility and its factual findings
regarding the content of this meeting.

[21] Carry's testimony about this conversation differed
slightly from Segars.  3/28/12 Tr. at 223:3-16, 313:4-20.  Based
on Segars's demeanor at trial, his clarity in describing the
meeting, and his lack of personal involvement in these
proceedings, the Court relies upon his testimony describing the
meeting.

at 137:7-15.

2.  Carry's Decision

172. After meeting with Foley, Carry reviewed the case file in
     order to make a recommendation to Powell.

173. Carry listened to the audio recording of the Hearing and
     reviewed the appeals material.[22]  3/28/12 Tr. at 185:11-13;
     Ex. P-47 (Carry Dep.) at 9:3-10:6.

174. Carry considered both the Hearing Panel's recommendation and
     the Review Board's recommendation.  He did not give
     presumptive weight to the Review Board's recommendation.[23]

175. In considering whether there was sufficient evidence to find
     that the plaintiff violated Code section 3 regarding assault
     or threatened assault, Carry considered how the University

_____

[22] At trial, Carry also testified that he reviewed the
exhibits introduced by the plaintiff at the Hearing.  3/28/12 Tr.
at 185:14-17.  During his deposition, taken in December of 2009,
Carry stated explicitly that he did not review the exhibits and
when asked, did not remember any exhibits specifically.  Ex. P-47
(Carry Dep.) at 9:3-10:6, 65:2-20, 68:14-23, 158:9-11.  Given
these discrepancies, the Court cannot find that Carry reviewed
the exhibits.

[23] The Court makes this finding based on the following: At
his deposition, Carry denied that the Code required him to give
presumptive weight to the Review Board's recommendation until he
was read the Code provision.  He then testified that he did
consider the Review Board's decision more than the Hearing Panel.
Ex. P-47 (Carry Dep.) at 73:20-75:21.  He testified at trial that
his deposition testimony was mistaken because he usually uses the
term "weigh in favor" of the Review Board.  3/28/12 Tr. at
278:20-279:3.  He also testified that he gave the Review Board's
recommendation presumptive weight, but was unable to explain how
the presumption factored into his analysis.  Id. at 250:12-19;
255:23-257:12.

had handled situations involving a weapon and a police
officer in the past.  3/28/12 Tr. at 256:3-11.  He
determined that a threat of violence had occurred based on
the physical altercation between the plaintiff and Wolfe,
the possession of a weapon during this incident, and that
the plaintiff resisted arrest.  Id. at 331:3-15.

176. Carry gave weight to Wolfe's position as a police officer.[24]

177. Although it was not evidence at the Hearing, Carry relied
upon the specification paragraph included in the Hearing
Summary when he made his decision.[25]  Ex. P-47 (Carry Dep.)
at 172:5-173:1.

---

[24] At his deposition, Carry testified that although he could
not describe how the plaintiff used a weapon, he knew that the
officer reacted to the situation with concern.  Ex. P-47 (Carry
Dep.) at 109:19-110:7, 144:4-15.  He also said,

> [A]nytime a student brandishes a weapon, however you want to
> describe it, and is confronting an officer, we have
> expelled, and we have been consistent about that.  And when
> I reviewed this case, I didn't see anything that changed
> that part of the decision.  So the only thing that Kevin
> Furey could have said was, 'I wasn't there. That was my evil
> twin brother that did that.'  Otherwise, this was -- this was
> a case that caused great concern for the university that a
> student would be involved in an altercation involving a
> weapon and a police officer.

Id. at 166:8-21.

[25] During his deposition, Carry was asked whether he
considered the paragraph which became the specification in his
expulsion decision, and responded "Yes."  Ex. P-47 (Carry Dep.)
at 172:5-173:1. He also testified that "nothing that came before
me refuted that description of the incident."  Id. at 173:8-17;
see also id. at 58:18-59:3; 60:20-23 (referencing the summary in
his decision making).  This testimony was not contradicted at
trial, although Carry testified that it was his understanding
that the Hearing Summary was not evidence.  3/28/12 Tr. at 327:5-
16.

178. In determining the appropriate sanction Carry again
     considered past University treatment of students involved in
     incidents involving a weapon and a police officer.  In those
     cases, the University had always expelled.  3/28/12 Tr. at
     256:13-257:21.

     J.   Carry's Recommendation to Powell

179. Carry recommended to Powell that she follow the decision of
     the Hearing Panel and expel the plaintiff.  3/28/12 Tr. at
     240:12-17.

180. Powell did not meet with Foley or review any material in
     connection with the case.  3/30/12 Tr. at 8:25-9:2; 4/2/12
     Tr. at 157:20-22.  She did not listen to the audio recording
     of the Hearing.  3/30/12 Tr. at 42:10-14.

181. Powell relied upon Carry's review and recommendation to make
     her decision.  3/30/12 Tr. at 8:25-9:2, 14:6-10, 63:1-4.

182. After speaking with Powell, Carry directed that a letter be
     written for Powell's signature.  3/28/12 Tr. at 295:13-
     296:15.

183. A letter dated May 27, 2009 was sent to the plaintiff from
     Powell informing him that she would be upholding the Hearing
     Panel's finding of responsibility and imposing a sanction of
     immediate expulsion.  Ex. P-40.

-42-

K.   Post Appeal Events

184. In a letter dated June 9, 2009, Boyce Furey wrote to Powell
     to request reconsideration of her decision to expel the
     plaintiff.  This letter included new information not known
     at the time of the Hearing, including that there was an on-
     going police investigation of Wolfe's conduct on that night.
     Ex. P-41.[26]

185. Powell did not read the June 9, 2009 letter.  3/30/12 Tr. at
     31:2-5.  Powell's office forwarded this letter to the
     University General Counsel's office.  3/30/12  Tr. at 35:9-
     18.

186. Harrison received the letter and referred it to outside
     counsel because this litigation had begun.  4/4/12 Tr. at
     186:13-18.


L.   Absent Witnesses

187. All five of the witnesses who did not attend the Hearing
     provided descriptions of their version of the incident in
     interviews to the Philadelphia police, Temple police, and/or
     during discovery in this case.  The Court briefly summarizes
     each witness's version of events.

---

[26] The defendants' objection to this exhibit on the grounds
of relevance is overruled.

188. Steve Robinson.[27]  On April 5, 2008, Robinson accompanied
     Wolfe to the 16th District Police Station to pick up court
     notices and then to Monument Street to pick up Wolfe's
     family members from a party.  After they had picked the
     passengers up, and were driving along Monument Street,
     Robinson heard yelling.  He heard Wolfe ask the plaintiff if
     he was okay and then saw the plaintiff waving a machete.  He
     could not recall if the plaintiff moved towards Wolfe's car.
     Wolfe got out of the car and identified himself as a police
     officer several times and showed his badge once.  The
     plaintiff looked scared and he eventually dropped the
     machete.  Wolfe tried to effect the arrest and the two
     struggled on the ground until Temple police arrived.
     3/27/12 Tr. at 215:22-216:25; 206:14-16.  Robinson did not
     see anyone in the street beside the plaintiff and the
     individuals with Wolfe.  Id. at 208:1-10.  He observed that
     the plaintiff was drunk.  Ex. P-18.

189. Douglas Segars.[28]  On April 5, 2008, Segars attended a party
     and called Wolfe for a ride home.  Segars and Anderson were
     riding in the back seat of Wolfe's car when he heard

_____

[27] This description is taken primarily from Robinson's
testimony at trial and also from two statements: one made to
Philadelphia Police Detective Roach on April 5, 2008 and another
to Philadelphia Police Lt. Saggese on September 30, 2008.  Exs.
P-89; P-18; D-73.

[28] This description is taken from Segars's testimony at
trial.

yelling, possibly from someone in the car.  He looked out
the car window and saw the plaintiff holding a machete and
gesturing towards Wolfe's car.  3/27/12 Tr. at 59:24-60:6;
125:25-126:16.  Wolfe got out of the car and identified
himself as a cop.  Segars then saw Wolfe and Furey on the
ground and then saw the Temple Police arrive.  <u>Id.</u> at
125:14-127:16.  Segars got out of Wolfe's car for a moment
and was back inside the car when the Temple police arrived.
<u>Id.</u> at 127:1-20.  Segars did not recall seeing a big group
of people on the street that night.  <u>Id.</u> at 77:23-78:3.

190. Colin Anderson[29]  Anderson was in the back seat of Wolfe's
car when he saw Wolfe get out of the car and walk towards
the plaintiff, who was holding an elongated object down by
his side.  He saw Wolfe draw his gun and identify himself as
a cop.  Wolfe ordered the plaintiff to drop the item at
least three times and then pulled the plaintiff to the
ground.  Anderson got out of the car briefly and was told by
Wolfe to get back inside the car.  He did not remember if
the plaintiff approached Wolfe, or if the plaintiff was
yelling when the incident occurred.  Anderson was not able
to identify the elongated object as a machete until after
the plaintiff was handcuffed.  Ex. P-15.

---

[29] This description is taken from Anderson's statement to
Lt. Saggese on November 17, 2008.  Exs. P-15, P-18.

191. Officer Binder:[30] While on patrol on Monument Street, Binder
     observed two men fighting in a lot beside the road.  Ex. P-
     53 (Binder Dep) at 24:10-25:21.  One man was on the ground,
     the other on top of him.  When Binder approached to grab the
     male on top, he identified himself as an off-duty police
     officer.  Id. at 93:2-24.  Binder helped hold the plaintiff
     to the ground and supplied Wolfe with handcuffs to handcuff
     the plaintiff.  Id. at 98:18-21, 105:19-24.  Once detained,
     the plaintiff refused to get into Binder's car.  Ex. P-16 at
     2.  Binder could tell the plaintiff had been drinking
     because he smelled of alcohol, his speech was slurred, and
     his eyes were bloodshot.  Id. at 3.  Binder observed a minor
     abrasion on the plaintiff's forehead and a mark about an
     inch wide below his left eye.  Id. at 2.  He took the
     plaintiff to Central Detective where he was told the
     plaintiff had to be medically checked out before he would be
     accepted.  Binder then took the plaintiff to Hahnemann
     Hospital and then back to Central Detective around 7 a.m.
     Ex. P-53 (Binder Dep.) at 126:11-129:1, 133:19-23.

---

     [30] This description is taken from Binder's deposition, which
was submitted to the Court in lieu of trial testimony, and from
Binder's statements to Allen Hulmes on April 7, 2008 for a Temple
Police Department Incident Report and to Lt. Saggese on November
21, 2009.  Exs. P-53 (Binder Dep); P-6; P-16; 4/3/12 Tr. at
128:7-13.

192. Officer Harvey.[31]  Harvey drove to Monument Street in response to a radio call from Binder reporting a fight.  P-54 (Harvey Dep) at 46:16-22.  When Binder arrived, the plaintiff was sitting on the ground in handcuffs.  Id. at 8:20-9:16.  He saw Wolfe standing about six feet away, and saw both his gun and badge.  Id. at 9:10-13.  Harvey also saw two individuals in Wolfe's car.  Id. at 11:9-12.  Harvey had been to Monument Street twice that night because of noise complaints at a party.  While responding to those calls, he saw Wolfe's car parked in front of the house where the party was occurring.  Id. at 30:17-31:31; P-16.  Harvey observed that the plaintiff had a strong odor of alcohol and slurred speech.  P-54 (Harvey Dep) at 158:22-159:9.

M.   Other Events

193. After this litigation began, the plaintiff discovered a photograph of Kenyatta and Segars posted on Facebook.com.  P-38.[32]

194. The photograph was taken after a talent show Segars helped

---

[31] This statement was taken from Harvey's deposition, which was submitted to the Court in lieu of trial testimony, and Harvey's statement to Allen Hulmes on April 8, 2008 for a Temple University Police Department Incident Report.  Exs. P-54 (Harvey Dep); P-16; 4/3/12 Tr. at 128:7-13.

[32] The defendants' objection to this exhibit for lack of foundation is overruled.  Segars and Kenyatta both identified themselves in the photograph.  3/27/12 Tr. at 88:6-10; 4/4/12 Tr. at 258:17-20

-47-

to organize and in which Kenyatta participated.  3/27/12 Tr.
at 88:11-18; 4/4/12 Tr. at 257:11-16.  Kenyatta did not know
Segars when the photograph was taken after the talent show
or at anytime before the Hearing.  4/4/12 Tr. at 258:8-16.

## III. Conclusions of Law

There is no dispute that the plaintiff, a student at a
state-funded school, is entitled to procedural due process in a
disciplinary action against him.  The difficult question in this
case is what process is due.  Morrissey v. Brewer, 408 U.S. 471,
481 (1972).  The Court will describe the basic legal principles
of due process in student disciplinary proceedings before
addressing the plaintiff's challenges in this case.

### A.   Due Process Requirements

The requirement of due process is a requirement of
fundamental fairness.  There is no fixed standard that applies in
all cases.  Instead, due process implies a flexible standard that
varies with the nature of the interests affected and the
circumstances of the deprivation.  Gorman v. Univ. of Rhode
Island, 837 F.2d 7, 12 (1st Cir. 1988).

In 1975, the Supreme Court held that, at a minimum,
when a school charges a student with a disciplinary violation, it
must provide "notice and an opportunity for hearing appropriate
to the nature of the case."  Goss v. Lopez, 419 U.S. 565, 579

-48-

(1975).  In Goss, a public high school student faced a ten-day academic suspension.  The Court held that due process required that he be given oral or written notice of the charges against him, and if he denied those charges, an explanation of the evidence against him and an opportunity to present his side of the story.  Id. at 581.

The Court declined to require "even truncated trial type procedures," recognizing the limited administrative resources available to academic institutions.  Id. at 583.  The Court was concerned that requiring formal disciplinary proceedings would divert resources from the school's educational mission and destroy the effectiveness of the teaching component of the discipline process.  Id. at 583.  Thus, in the context of a ten-day suspension, the Court held that a hearing could occur almost immediately after notice was provided, and the school did not need to give the student "the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident." Id. at 583.  Due process required an "informal give-and-take" between the student and the administrative body disciplining him where the student had the opportunity to "characterize his conduct and put it in what he deems the proper context." Id. at 584.  But the Court also recognized that longer suspensions or

expulsions might require more formal procedures.[33]   Id.

        In Palmer, the Court of Appeals for the Third Circuit considered whether a student facing a sixty-day athletic suspension in addition to a ten-day academic suspension was entitled to additional process.  Palmer v. Merluzzi, 868 F.2d 90 (3d Cir. 1989).  In that case, the student learned of the accusations against him and the evidence supporting those accusations from two school administrators during an informal hearing.  Id. at 94.  The student did not contest the sufficiency of the process for the academic suspension, but argued that he should have been told that an athletic suspension was a possible sanction against him.

        To determine the process due, the Court of Appeals applied the three balancing factors from Mathews v. Eldridge: 1) the private interests at stake; 2) the governmental interests at stake, including the government function involved and the fiscal and administrative burdens entailed by additional or substitute requirements; and 3) the fairness and reliability of the existing procedures and the probable value, if any, of any additional or

---

        [33] Three years later, the Supreme Court distinguished between the due process requirements for a student dismissed for disciplinary reasons and one dismissed for academic reasons.  Bd. of Curators of the Univ. of Missouri v. Horowitz, 435 U.S. 78, 88-89 (1978).  In Horowitz, the Court held that dismissals for academic reasons rely on the subjective and evaluative judgment of school officials.  Id. at 90.  This determination is not readily adapted to the procedural tools of judicial or administrative decision making, and thus requires less stringent procedural requirements.  Id. at 86, 90.

substitute procedural safeguards.  Id. at 95; Mathews v. Eldridge, 424 U.S. 319, 334-35 (1976).  As in Goss, the student's interest was avoiding unfair or mistaken exclusion from the benefits of the educational system.  This included the loss of education, potential damage to the student's reputation, and potential interference with later opportunities for education and employment.  Palmer, 868 F.2d at 95.  The school's interest included the need to maintain order and discipline in a way that contributed to the educational process and did not unduly burden its limited resources.  Id.

        The Court of Appeals held that additional procedural requirements would create expense and disruption without significantly increasing the reliability and fairness of the disciplinary process.  Id. at 95-96.  Given the nature of the offense, the court held that the student should have been aware of the possible athletic suspension and declined to find a due process requirement that the school explicitly notify the student of all possible sanctions.  Process was sufficient because the student had the opportunity at the informal hearing to explain his version of events and argue for leniency had he so chosen. Id. at 94-95.

        Before the Supreme Court's decisions in Goss and Mathews, the Court of Appeals for the Third Circuit also addressed due process in disciplinary proceedings in Sill v.

Pennsylvania State University. 462 F.2d 463 (3d Cir. 1972).  The
students in Sill challenged a special hearing panel created by
the University's Board to hear charges relating to disruptions on
campus.  The court held that there was no due process right to be
heard by any particular panel, and the basic requirements of due
process were fulfilled by notice and the opportunity to be heard
by a fair and impartial tribunal.  Id. at 469.

It is within this legal framework that the Court
considers the plaintiff's claim that he was denied procedural due
process.

B.   The Plaintiff's Challenges

The Court begins with the first two Mathews factors.
The plaintiff's private interests are significant.  See Dixon v.
Ala. State Bd. of Educ., 294 F.2d 150, 157 (5th Cir. 1961).
Expulsion denies the student the benefits of education at his
chosen school.  Expulsion also damages the student's academic and
professional reputation, even more so when the charges against
him are serious enough to constitute criminal behavior.
Expulsion is likely to affect the student's ability to enroll at
other institutions of higher education and to pursue a career.
For this reason, the Supreme Court recognized in Goss that a
student facing a more serious sanctions than a short suspension
may be entitled to more formal procedures than required in that
case.  Expulsion is perhaps the most serious sanction a school

-52-

can impose.  Therefore, within the <u>Mathews</u> balancing test, this factor weighs in favor of the most formal procedural protections.

The defendants' interests are similar to those in <u>Goss</u>, <u>Palmer</u>, and <u>Sill</u>.  Temple University is an educational institution.  It has an interest in maintaining safety on its campus and within its student body.  It also has a strong interest in allocating resources to best achieve its educational mission and the educational component of its disciplinary process.

The plaintiff argues that the defendants committed numerous due process violations.  The Court has grouped the plaintiff's claims into the following categories:

1. facial challenge to the Code's jurisdiction;
2. departures from the Code of Conduct;
3. failure to provide notice;
4. failure to afford the right to remain silent, right to counsel, and to cross-examination;
5. absence of witnesses and alleged perjured testimony;
6. bias and impartiality;
7. other issues with the fairness of the hearing process.

The Court will consider each individual alleged violation in the context of the procedural safeguards that were used and those which could have been substituted or added, the third <u>Mathews</u> factor.  After considering each aspect of the process individually, the Court then analyzes the disciplinary process as a whole.

1.   <u>Facial Challenge to the Code</u>

At closing arguments before the Court, the plaintiff argued that Temple University lacks jurisdiction over students' off-campus behavior and that the alleged behavior giving rise to the plaintiff's expulsion was not covered by the claimed jurisdiction.  Although the Court notes that this facial attack on the Code of Conduct was not included in the plaintiff's second amended complaint, the Court has considered this challenge and finds it without merit.  The Court finds no constitutional violation in the University's exercise of jurisdiction generally or in this case.

Temple was entitled to exercise jurisdiction beyond the geographic boarder of its campus.  In <u>Kusnir</u>, the Commonwealth Court of Pennsylvania rejected a student's argument that he could not be suspended for primarily off-campus activities.  <u>Kusnir v. Leach</u>, 439 A.2d 223, 226 (Pa. Commw. Ct. 1982).  The court said, "[o]bviously, a college has a vital interest in the character of its students, and may regard off-campus behavior as a reflection of a student's character and his fitness to be a member of the student body."  <u>Id.</u>  In addition, Pennsylvania law gives campus police jurisdiction over campus "grounds and within 500 yards of the grounds of the college or university."  71 Pa. Cons. Stat. § 646.1(a)(6) (2009).

The plaintiff argues that he could not have known the

-54-

location of the 500 yard boundary or what actions were within the
school's jurisdiction.  Codes of conduct for educational
institutions do not have to satisfy the same standards for
clarity as must criminal statutes.  <u>Sill</u>, 462 F.2d at 467.
Temple had authority to take disciplinary action based on off-
campus behavior.

   The Court also finds that Temple followed its Code in
asserting jurisdiction in this case.  The events at dispute in
this case occurred within 500 yards of Temple's campus and
implicated the safety of University community members, thus
meeting the jurisdictional requirements of the Code.  FoF ¶¶ 12;
43.

   2. <u>Departures from the Code of Conduct</u>

   The plaintiff also argues that he was denied due
process when Temple failed to follow its Code of Conduct.  The
plaintiff challenges Temple's failure to hold the Pre-Hearing
Meeting and Hearing within the time frames required by the Code
and argues that Temple departed from the Code by allowing Seiss
and Harrison to attend a closed Hearing and allowing Wolfe to
attend the Panel's announcements on responsibility and sanctions.
In addition, the plaintiff contends that a violation of the Code
occurred when the Review Board determined that a procedural
violation had occurred because a panel member and witness were
Facebook friends, but did not recommend that a new hearing be

held.

A minor deviation from the school's regulations that does not affect the fundamental fairness of the process is not itself a due process violation. <u>Winnick v. Manning</u>, 460 F.2d 545, 550 (2d Cir. 1972). On their own, none of these claimed violations of the Code rise to the level of due process deprivations because none of them individually affected the reliability and fairness of the disciplinary process.

The Pre-Hearing Meeting and Hearing were delayed several times. The Code Administrator has the authority under the Code to extend the time limits for these meetings, and several of the delays were at the request of the plaintiff and Boyce Furey. Moreover, the plaintiff does not describe any way in which he was prejudiced by the delay.[34] FoF ¶¶ 17; 20; 51; 54-56; 65-66.

Seiss and Harrison had been involved in the plaintiff's disciplinary case for several months and attended the Hearing in their capacities as University employees. Seiss had handled the majority of the plaintiff's case prior to the Hearing and attended in that role. FoF ¶¶ 28; 41-45; 51-52; 55-68; 79. Although Harrison was brought into the case because of Boyce

---

[34] The Court acknowledges Woltemate's statement in an e-mail to Foley, "Let's just get this one done already." Woltemate, however, was not a decision maker in the disciplinary matter and did not have any interaction with any of the decision makers in the matter. FoF ¶ 74.

Furey's involvement, her attendance at the Pre-Hearing Meeting and the Hearing served to increase the legal and adversarial tone of the disciplinary process, and contributed to the confrontational dynamic that developed among all of the parties involved.  FoF ¶ 52.

Similarly, there was no reason for Wolfe to attend the announcement of the Panel's decisions, as hearings are not open to the public, and he had testified hours before at the start of the Hearing, but his presence alone is not a due process violation.  FoF ¶¶ 28; 100; 146.  His presence created the impression that Wolfe had a close relationship or alignment of interests with the University employees involved in the plaintiff's case.  This is especially true in light of the Panel's treatment of Wolfe during the Hearing, discussed in depth below.

Finally, although the Code of Conduct dictates that the Review Board should recommend a new hearing if there is a procedural violation, the Court concludes that no constitutional violation occurred as a result of their failure to do so here.  There is no evidence of a relationship between Kenyatta and Wolfe, and thus no procedural defect because the two were Facebook "friends."  FoF ¶¶ 32; 158; 160-62.

3.   <u>Failure to Provide Notice</u>

The plaintiff contends that he was not given proper notice of the charges against him, the possible sanctions he faced, or the statements of the witnesses called to testify at the Hearing.  The plaintiff also argues that he did not have a meaningful opportunity to defend himself against claims made at the Hearing but not included in the Charge Notice, such as the allegation that he was intoxicated at the time of the incident. The Court concludes that Temple provided adequate notice to the plaintiff.

Along with opportunity to be heard, notice is one of the most basic requirements of due process.  <u>Goss</u>, 419 U.S. at 581; <u>Flaim v. Med. College of Ohio</u>, 418 F.3d 629, 635 (6th Cir. 2005).  In <u>Goss</u>, the Supreme Court held that oral notice of the charges against the student were sufficient in the context of a ten-day suspension.  Where the private interest is stronger it is more likely that a formal written notice, identifying the charged violations and possible penalties, is required.  <u>Flaim</u>, 418 F.3d at 635.  Notice should include the specific charges and the grounds, which, if proven, justify expulsion.  <u>Palmer</u>, 868 F.2d at 94; <u>Dixon</u>, 294 F.2d at 158.

In <u>Flaim</u>, the Sixth Circuit addressed the issue of adequate notice in an expulsion hearing.  In that case, the student argued that he lacked sufficient notice because he was

not provided with the evidence and testimony the school intended to present against him.  418 F.3d at 639.  The court held that notice was sufficient so long as it provided the student with a meaningful opportunity to prepare for the disciplinary hearing. Id.  There was no reduced risk of error from requiring the University to provide evidence, witnesses, and copies of documents, which were an additional expense and administrative burden on the school.  Id.

In this case, the plaintiff was provided with notice of the charges against him and the police referral upon which those charges were based.  This information was provided in the Charge Notice sent to the plaintiff and in the Hearing Summary provided on the day of the Hearing.  In addition, the plaintiff was able to meet with the Code Administrator at the Pre-Hearing Meeting to discuss the charges against him.  He was also provided with the names of all the witnesses the University intended to present at the Hearing.  FoF ¶¶ 44-50; 56; 60; 63-64; 86-88; 90.  This notice was sufficient to give the plaintiff a meaningful opportunity to defend himself against the charges at the Hearing.

As to the statements of witnesses, there is no evidence that the University had statements from any of the witnesses asked to testify at the Hearing.  FoF ¶¶ 41-42.  The plaintiff knew the names of the witnesses who could appear at the Hearing and the basis of the charges against him.  Thus the only

information the University had about the incident was given to
the plaintiff.  FoF ¶¶ 48; 60; 64; 88; 90.

The Court declines to impose an investigatory
requirement on school administrators to obtain statements from
witnesses prior to a hearing.  Advance notice of what witnesses
might say at the Hearing, or the opportunity to present
statements of witnesses who do not appear, might be helpful to an
accused student.  But applying the third Mathews factor, the
Court concludes that the administrative costs of an obligation to
obtain witness statements outweighs any benefit from the
possibility that this procedure would reduce the likelihood of
error.

On the issue of notice of possible sanctions, the
Charge Notice sent to the plaintiff lists the charges and directs
the student to the Temple Code of Conduct.  The Code of Conduct
makes clear that violations of the Code can result in expulsion.
FoF ¶¶ 13; 46-48.  The Court of Appeals for the Third Circuit
declined to hold that due process requires the school to inform
the student of the possible sanctions that could result from
charged violations when possible sanctions are knowable based on
other published materials or the nature of the charges.  Palmer,
868 F.2d at 94.  Palmer involved a suspension and not an
expulsion.  Therefore this Court considers whether the greater
deprivation requires the school to state explicitly the possible

sanctions.

Considering the third <u>Mathews</u> factor, it is unclear what additional protection would be provided to the student if the school duplicated the Code's language in the Charge Notice. The plaintiff was aware of the seriousness of the charged offense and was therefore aware that the sanctions could be equally serious. He presented evidence and witnesses in his defense and treated the Hearing with the seriousness it merited. FoF ¶¶ 46-51; 80-81; 118-20. The Court finds that due process did not require the University to inform the plaintiff explicitly on the Charge Notice that expulsion was a possible sanction.

Finally, the Court finds that the plaintiff was not denied due process when testimony at the Hearing included information beyond the summary provided in the Charge Notice. The plaintiff was not charged with any additional offenses beyond those included in the Charge Notice. The Court notes that the plaintiff did not raise this issue during the Hearing, nor request any continuances or breaks during the Hearing to respond to new information. In addition, the plaintiff had the opportunity to hear all of the testimony presented to the Panel and put that information in context or explain his disagreement with it. FoF ¶¶ 46; 119; 142.

4.   Right to Remain Silent, Cross-examine Witnesses,
     and Right to Counsel

The plaintiff claims that he was denied due process when he was not informed of his right to remain silent, when he was not able to cross examine witnesses, and when his counsel was not allowed to participate actively in the Hearing procedure. The plaintiff claims that these protections should have been afforded because he was facing criminal charges for the same underlying behavior at issue in the Temple disciplinary hearing.

a. Right to Remain Silent

To the extent there is a right to remain silent in disciplinary proceedings while the student is also facing criminal charges, the Court does not find that the plaintiff was denied due process on that basis.  The plaintiff was informed on several occasions that he was not required to testify at the Hearing.  This information is included in the Code of Conduct. Greenstein also informed the plaintiff that he did not need to testify before the Panel at the start of the Hearing.  FoF ¶¶ 27; 118.  Although the plaintiff now argues that he did not know he could refuse to testify, he never raised this issue with the Panel nor requested a continuance while his criminal case was pending.

b. Cross-Examination

Due process can require that the student have an

-62-

opportunity to cross examine witnesses.  In Winnick, the Second Circuit held that there was no requirement that a student be able to cross-examine a witness whose testimony is not determinative to the outcome of the case.  460 F.2d at 549.  But the court noted that "if this case had resolved itself into a problem of credibility, cross-examination of witnesses might have been essential to a fair hearing."  Id. at 550; see also Flaim, 418 F.3d at 641 (cross examination not necessary because the relevant facts were undisputed).

        The purpose of cross-examination is to ensure that issues of credibility and truthfulness are made clear to the decision makers.  Given the importance of credibility in this Hearing, discussed more below, the Court considers this an important safeguard.

        The Court concludes that due process required that the plaintiff be able to cross-examine witnesses, and finds that the plaintiff was afforded that right because the plaintiff was able to cross examine the witnesses by posing questions through the Chair.  The plaintiff was able to pose questions to all of the witnesses, including Wolfe.  FoF ¶¶ 81; 102-03.

        The ability to pose questions through the Chair gave the plaintiff the opportunity to raise issues of credibility and truthfulness.  In addition, the Panel was able to question witnesses itself, and therefore capable of probing issues of

-63-

credibility.  FoF ¶¶ 23; 101-03; 121.  Considering the third
Mathews factor, any additional safeguard provided by direct cross
examination by the plaintiff or his counsel would be outweighed
by the administrative cost on the school to set parameters for
appropriate cross examination, train panel chairs to make
decisions on those rules, and create a more adversarial system.
See Donohue v. Baker, 976 F. Supp. 136, 147 (N.D.N.Y. 1997)
("[D]ue process required that the panel permit the plaintiff to .
. . direct questions to his accuser through the panel."); Nash v.
Auburn Univ., 812 F.2d 655, 664 (11th Cir. 1987) (sufficient that
students facing expulsion had opportunity to pose questions
through the chancellor of the board hearing their case).

         Although the Court concludes that the University's
process allowing for cross-examination did not violate the
plaintiff's due process, the manner in which Wolfe's questioning
was carried out, especially in contrast to the Panel's
questioning of the plaintiff, raises issues of fairness in the
Hearing, discussed in more depth below.

                    c. Right to Counsel

         Several courts have held that a student is entitled to
have legal counsel in a disciplinary hearing when the student is
also facing criminal sanctions for the same underlying conduct.[35]

───────────────

         [35] Courts have also speculated that due process could
require active representation by counsel when the school's case
is presented by an attorney or the procedures are unusually

                              -64-

In Gabrilowitz, the First Circuit recognized that an accused student also charged with a criminal offense faced a legal dilemma: either mount a full defense in the disciplinary case and risk jeopardizing his defense in the criminal case, or risk his college degree by failing to fully defend himself. Gabrilowitz v. Newman, 582 F.2d 100, 103 (1st Cir. 1978). The court held that due process required that the student be allowed to have the assistance of counsel for consultation and advice during the disciplinary hearing. Id. at 101. Similarly, in Osteen, the Seventh Circuit recognized that a student facing criminal charges and expulsion might have a due process right to consult with legal counsel during a disciplinary hearing. Osteen v. Henley, 13 F.3d 221, 225 (7th Cir. 1993).

But both Circuit Courts limited this right to the ability to obtain advice. Neither held that a student is entitled to be actively represented by counsel as he would be in a trial. Requiring that a lawyer be able to cross-examine witnesses, submit and object to documents, and address the tribunal "would force student disciplinary proceedings into the mold of adversary litigation." Osteen, 13 F.3d at 225;

_____

complex. Flaim, 418 F.3d at 640-41; Jaksa v. Regents of the Univ. of Mich., 597 F. Supp. 1245, 1252 (E.D. Mich. 1984). That is not an issue presented for this Court. The University's case was not presented by an attorney, and the procedures were straightforward. The plaintiff was able to pose questions to the University's witnesses, question his own witnesses, present evidence, and give his version of events to the Hearing Panel. FoF ¶¶ 80-81; 102-03; 119-20.

Gabrilowitz, 582 F.2d at 103.  Thus, to the extent cases have held that counsel is required, it is to give the advice necessary to protect the student's Fifth Amendment rights, not to take an active part in the Hearing.  Donohue, 976 F. Supp. at 146.

In support of his argument for active representation, the plaintiff cites Coulter, a district court opinion granting a preliminary injunction requiring active participation by counsel in a student's disciplinary proceeding.[36]  Coulter v. E. Stroudsburg Univ., No. 10-877, 2010 WL 1816632, at *3 (W.D. Pa. May 5, 2010).  To the extent it required the active participation of counsel, this order was stayed by the Court of Appeals for the Third Circuit.  No. 10-2612 (3d Cir. Sept. 28, 2010).  The Court is not persuaded by this opinion that does not address the earlier cases on this issue.

In this case, the plaintiff had counsel available to advise him at the Hearing and throughout the disciplinary process.  The plaintiff was able to consult with his counsel in preparation for the Hearing.  The plaintiff was able to obtain advice from counsel during the Hearing, although Boyce Furey's refusal to comply with Hearing procedures and the Panel's clear frustration with Boyce Furey at times may have made this more

---

[36]  Another district court, in Mills, held that counsel is required before school can change or deny disabled students special education placement.  Mills v. Bd. of Educ. of the Dist. of Columbia, 348 F. Supp. 866, 881 (D.D.C. 1972).  This case is distinguishable.  The students involved could not represent themselves or their interests at a hearing.

difficult.  The Court also notes that the plaintiff did not raise
the issue of pending criminal charges or his Fifth Amendment
right to either the Code Administrators or the Hearing Panel.
FoF ¶¶ 50-51; 56; 78; 131; 136-38.

On the third <u>Mathews</u> factor, any additional safeguard
provided by allowing counsel to actively represent the student
would be outweighed by the adversarial element and legal
expertise required on the part of the school to implement this
procedure.  The Court therefore agrees with the courts in <u>Osteen</u>
and <u>Donohue</u>, that active representation by counsel is not
required by due process.  If the University were required to give
the student active representation by counsel, it would also have
to train panelists and administrators adept at handing those
legal issues.  <u>See</u> <u>Flaim</u>, 418 F.3d at 640-41 (counsel would
create too much expense and procedural complexity).

5.   Absence of Witnesses and Alleged Perjured
     Testimony

The plaintiff requested that the Temple police officers
and the individuals accompanying Wolfe on April 5, 2008 attend
the Hearing.  Five witnesses, including the two officers who
first arrived on the scene, and all three of the individuals
accompanying Wolfe, did not attend the Hearing.  FoF ¶¶ 92; 188-
92.  The plaintiff argues that he was denied due process when he
was not given the contact information for these witnesses in

order to secure their attendance and when the Hearing continued
without their testimony.

　　　　The absence of these witnesses raises a due process
issue because of the importance of credibility in this case.  The
plaintiff was charged with attempted or actual assault and
battery, possession of a weapon, and disorderly conduct.  In
large part, these charges all turned on one issue: whether the
plaintiff instigated or escalated a confrontation with Wolfe.
FoF ¶ 46.  The Panel heard from only two witnesses who could
address that issue, Wolfe and the plaintiff.  The discrepancies
between their testimony was significant.  Wolfe told the Panel
that the interaction began when he saw the plaintiff yelling and
possibly presenting a threat to a group of students leaving a
party on the street.  He told the Panel that when he asked the
plaintiff what he had retrieved from the car, the plaintiff
suddenly raised a machete in a combat fashion and rushed towards
Wolfe's car.  FoF ¶ 100.  The plaintiff disputed this
description, particularly that he approached Wolfe's car, and
questioned whether Wolfe had been drinking at a party earlier in
the event.  FoF ¶ 120.

　　　　Notably, none of the absent witness's statements
supported Wolfe's testimony that there was a crowd of students on
Monument Street, that the plaintiff started yelling at Wolfe's
car, or that the plaintiff moved towards Wolfe's car holding the

-68-

machete.   In addition, one of the police officers had seen Wolfe's car outside the party on Monument street earlier in the evening.   FoF ¶¶ 188-92.

Of course, even with this testimony, the Panel may still have reached the same conclusion, and could well have believed Wolfe's version of events and not the plaintiff's testimony.   The witnesses did not support the plaintiff's testimony that he was approached and attacked by five men, including Wolfe, or that Wolfe failed to identify himself as a police officer.   And nearly all of the witnesses reported that the plaintiff appeared to be intoxicated, a characterization he adamantly disputed at the Hearing.   FoF ¶¶ 188-92.

The substance of this dispute is not for this Court to determine.   But when a hearing on serious charges turns on issues of credibility, as this Hearing did, the importance of a fair tribunal, where the testimony of all of the witnesses is examined for truthfulness, is heightened.

The Court does not find a due process violation in Temple's failure to provide the plaintiff with contact information for the witnesses.   As discussed above, there is no discovery requirement in an academic disciplinary proceeding. Under the Mathews test, the University has an understandable interest in maintaining the privacy of its students and community members and supporting the non-adversarial nature of its

disciplinary proceedings which would be harmed by the requirement of providing contact information.

The Code Administrator contacted each of the witnesses to request their presence at the Hearing.  FoF ¶¶ 70-73; 97.  In the normal course of disciplinary proceedings, the Code Administrator's effort would be sufficient.  But given that the plaintiff was unable to contact the witnesses himself, the University had an obligation to ensure that it was fair to go forward with the Hearing without the witnesses.  Neither Seiss nor Foley considered or discussed the need to postpone the Hearing if witnesses did not attend.  FoF ¶ 96.  The plaintiff was not informed that witnesses would not be attending, even when the University knew this information before the Hearing.  The plaintiff was not able to address this issue until the Hearing, when Greenstein was apparently unable to accommodate the plaintiff's request for a continuance.  FoF ¶¶ 72; 74-75; 93-95.

The absence of the witnesses also affected the fundamental reliability and fairness in the Hearing and appeal. The absence of these witnesses increased the University's obligation to ensure that it provided a fair hearing and a fair appeal, where credibility could be properly judged.

The plaintiff also argues that the Panel relied upon Wolfe's perjured testimony.  Even if Wolfe committed perjury, there is no evidence that the Panel members knew that he had.

The plaintiff's concern about Wolfe's testimony relates to his argument that Temple should have done more to ensure the other witnesses testified and conducted a fair hearing so Wolfe's credibility was properly judged, an issue that is discussed more below.

### 6.   Bias and Impartiality

The plaintiff claims that he was denied due process because of bias against him during the Hearing.  As evidence of this bias, the plaintiff points to Kenyatta's relationship with Wolfe and Segars, statements made by Panel members during the Hearing, the use of the Full Panel to hear his case, and the involvement of Seiss, Harrison, and Carry in the process.

An impartial and unbiased adjudicator is a fundamental part of due process.  Sill, 462 F.2d at 469; Gorman, 837 F.2d at 15; Nash, 812 F.2d at 665; Winnick, 460 F.2d at 548.  In disciplinary hearings, there is a presumption of impartiality in favor of the school administrators.  The plaintiff bears the burden of rebutting this presumption with sufficient evidence. Gorman, 837 F.2d at 15.  Allegations of "prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences."  Id. (quoting Duke v. N. Texas State Univ., 469 F.2d 829, 834 (5th Cir. 1972)).

The Court concludes that the claims of impartiality or bias on the part of Panel members are not supported by evidence.

-71-

There is no evidence that Kenyatta was biased because of a relationship with either Wolfe or Segars.  Although Kenyatta and Wolfe were Facebook "friends," there is no evidence that the two knew one another.  There is similarly no evidence of a friendship or relationship between Kenyatta and Segars.  The two appeared in a photograph together following a student event, but did not know one another.  FoF ¶¶ 162; 193-94.

There is no evidence that Greenstein would favor a police officer over a civilian solely because of his position. The Court finds that he did not comment "why would a Philadelphia police officer lie?" during a break, and thus there is no evidence to support a claim of partiality on this ground.  FoF ¶ 122.  Adler's statement that the hospital record showed that the plaintiff "tested positive for alcohol" does not show bias on her part.  She obtained this information from a medical record provided by the plaintiff.[37]  FoF ¶¶ 125-27.

Finally, there is no evidence of bias from the use of a Full Panel, the fact that Seiss and Harrison attended the Hearing, or that Carry was kept informed of the progress of the disciplinary action against the plaintiff.  Seiss chose a Full

_____

[37] The Court notes that Adler did not clarify to her fellow Panel members that by "tested" she meant a "smell test," and did not mean that the plaintiff was intoxicated.  But the Court is not suggesting that her comments were made out of bias against the plaintiff.  The Court is not concerned that the Panel was influenced by this incomplete testimony because the Panel heard other testimony about the plaintiff's drinking prior to the incident.  FoF ¶¶ 100; 117; 120; 124.

Panel because of the seriousness of the charges and sanctions
facing the plaintiff.  FoF ¶ 19; 66.  There is no evidence that a
Full Panel always results in expulsion, or is a signal to the
Panel to decide in favor of expulsion.  Seiss and Harrison's
presence at the Hearing is discussed above.  Carry was informed
about the plaintiff's case as it progressed, but there is no
evidence that he took any active role to influence the scheduling
of the Hearing or the Panel's recommendation.  FoF ¶ 164.

       7.   Other Issues with the Fairness of the Hearing
           Process

      The Court is, however, troubled by several other
aspects of the plaintiff's Hearing and appeal.

        a.   The Hearing

      Additional concerning aspects of the Hearing include
the Hearing Summary supplied to the Panel at the start of the
Hearing; the Panel's general treatment of Wolfe and the
plaintiff; and the adversarial tone of the Hearing.  None of
these issues alone may constitute a due process violation, but
together they contribute to the Court's finding that the process
as a whole did not meet the requirement of due process.

      The Hearing Summary was provided to the Panel at the
start of the Hearing.  It is the Panel's first and only
introduction to the disciplinary case against the plaintiff.  The
plaintiff disputed the summary's description of events but he was

-73-

not able to give his version of events until after all of the
University witnesses testified.  Even if the Panel did not
consider the summary as evidence in the Hearing, the Panel did
not know the areas of factual dispute when the University
witnesses, including Wolfe, testified and were questioned.  FoF
¶¶ 41; 85-91.

        The Court is also concerned by the Panel's treatment of
different witnesses.  Wolfe was accorded significant respect.  He
was allowed to give a narrative of the events at issue without
close questioning by the Panel.  Only a few questions were asked
about where Wolfe had been prior to the incident or his
experience as a police officer, although those issues were
relevant to whether the off-duty officer had recently attended a
party or may have misjudged or misstated the plaintiff's
aggressiveness that morning.  FoF ¶¶ 100-01; 104.

        Wolfe was also permitted to make a prepared statement
to the Panel after a break, commenting on his prior testimony,
statements made by the plaintiff at a criminal hearing, and the
result of a police internal affairs investigation that no one
else had information about.  Wolfe was not asked for evidence to
support these statements.  In fact, Wolfe's characterization of
the plaintiff's statement at his preliminary hearing before Judge
Moore gave an incomplete description of those events; the terms
of the plaintiff's ARD agreement had not been finalized.

-74-

Similarly, Wolfe was apparently not exonerated of all wrongdoing involving the incident; Lt. Saggese concluded that Wolfe, not the plaintiff, created the confrontation between the two.  FoF ¶¶ 40; 108-111 & 110 n.15.

In contrast, the Panel closely questioned the plaintiff about the events of that evening, at times to the point of arguing.  Several panel members asked the plaintiff about his drinking on that night.  Kenyatta had to be told by Greenstein to let the plaintiff clarify an answer.  Adler questioned the plaintiff at length about his drinking and his treatment in the hospital after the incident.  Gumery questioned the plaintiff about his belief that he was being approached by a "gang" and argued with the plaintiff about whether he said that Wolfe had been in a car before he approached the plaintiff.  FoF ¶¶ 123-24; 128; 130-31; 133.

Because the plaintiff and Wolfe were the only witnesses at the Hearing who could testify about the instigation and development of the confrontation, the different treatment of the plaintiff and Wolfe may have made it more difficult for the plaintiff to present his version of events.  The Court recognizes that the Panel did question Wolfe about his statement of events, including where he had been prior to the incident and if he had been drinking, that the plaintiff's conduct was being considered by the Panel, and that the Panel had heard the differing versions

-75-

of the events when the plaintiff testified.  The Court does not criticize the Panel's apparent interest in delving into issues of detail and credibility, but the difference between the treatment of the plaintiff and Wolfe does not comport with the administrative, fact-finding role of the Panel.

This difference of treatment between the plaintiff and Wolfe also increased the adversarial nature of the Hearing, by conveying to the plaintiff that he was doubted while Wolfe was believed.  The Chair's control of Wolfe's cross-examination also increased the confrontational tone of the Hearing.  Asking the plaintiff to explain his reason for posing many questions and refusing to ask other questions placed the plaintiff and the Panel in adversarial roles.  FoF ¶ 103.

Although none of these issues alone may have created a due process violation, the Court concludes that these issues in combination affected the fairness of the disciplinary process as a whole.

b.  <u>The Appeal</u>

Although some aspects of the Hearing raise due process issues, the Court's main concern is with Carry's decision making during the appeal.  The Court does not need to determine whether due process requires an appeal in this case, because the University provided one.  FoF ¶¶ 30-34; 148-58.  Carry, as designee of the Vice President, had the responsibility to review

both the Hearing Panel and the Review Board's differing recommendations and make the final decision on the finding of responsibility and imposition of sanction.  In this case, the appeal was not just a review of the Panel's findings.  Both the Hearing Panel and the Review Board made recommendations, but the ultimate decision on responsibility and sanctions resided with Carry, as the Vice President's designee.  FoF ¶¶ 29; 32-34; 145; 157; 163; 172; 179-81.

There were serious flaws in Carry's review of the plaintiff's case.  First, Carry met ex parte with Segars, an eyewitness to the confrontation between Wolfe and the plaintiff, and obtained Segars's version of the events of the evening, even though Segars did not attend the Hearing.  FoF ¶¶ 168-70. Presentation of evidence to the decision-making body outside the presence of the accused can be a due process violation.  Newsome v. Batavia Local Sch. Dist., 842 F.2d 920, 927 (6th Cir. 1988). Ex parte conversations are a due process violation if "the integrity of the process and the fairness of the result" is tainted by the communication.  Gomes v. Univ. of Maine Sys., 365 F. Supp. 2d 6, 35 (D. Maine 2005).

The plaintiff did not have the opportunity to hear Segars's description of the events in order to contradict it or use those portions that may have been helpful to him.  There is no way to know exactly what Segars told Carry and whether that

recitation of events impacted Carry's decision; but when the final decision maker meets with a witness outside the presence of the accused student, the integrity of the process is undermined.

Second, Carry's review of the two recommendations deviated from the Code.  The two recommendations differed on both the finding of responsibility for the most serious Code violation and the recommended sanction.  Because Powell relied completely on Carry's review of the case to make a decision, Carry was obligated under the Code to give presumptive weight to the Review Board's finding.  He did not do so.  FoF ¶¶ 34; 142; 145; 156-57; 180-81.

The role of the Review Board, composed of students, faculty, and an administrator, who review the whole record and consider the allegations of error from the student is an important procedural safeguard against error.  It is part of a detailed and comprehensive process to get to the truth of the alleged conduct.  That whole process falls apart if the decision maker does not give the recommendations of the Review Board the deference required.  Here, Carry not only did not give presumptive weight to the recommendations of the Review Board, but he was not able to articulate the reasoning for his rejection of the Review Board's recommendations and acceptance of those of the Hearing Panel.  FoF ¶¶ 30-34; 174-78.

Carry stated that he wanted to remain consistent with

-78-

past University practice, expelling a student for an incident
involving a student, a police officer, and a weapon.  The premise
of his rationale was that the plaintiff assaulted or threatened
to assault a police officer.  But that was the issue to be
decided in this case involving an off-campus incident that
occurred at three a.m. between a student, who no one disputes was
getting a garden tool out of his trunk, and an off-duty police
officer in plain clothes.  FoF ¶¶ 100; 120; 156; 175; 178.

        It appears that Carry credited Wolfe's testimony and
the reasonableness of his actions solely on the basis of his
position as a police officer.  In both his deposition and at
trial, Carry was unable to describe the plaintiff's wrongful
behavior other than the fact that the plaintiff's actions during
the incident caused the officer to feel the need to respond.  FoF
¶ 176 & n.25.  This presumes that a police officer's response is
proper, one of the core questions in this case.  In addition,
Carry relied upon the Specification in the Hearing Summary, even
though it was not evidence in the Hearing.  During his
deposition, Carry testified that nothing in his review of the
Hearing contradicted the version of events described in the
summary.  FoF ¶ 177.  This testimony could show either a
preference to believe a report created by campus police or a
mistake about the available evidence.  Either way, it is
troubling that the final decision maker seems not to have

considered that Wolfe's description of events could be untrue.

Possible deference to police officers is particularly problematic given the University policy to expel when a student, police officer, and weapon are involved.  This sort of policy requires the school, and final decision maker, to ensure that the student has a fair and meaningful opportunity to contradict the officer's version of events.  It is not clear that the plaintiff had that opportunity in Carry's review.  Finally, Carry did not review all of the exhibits provided by the plaintiff at the Hearing.  FoF ¶ 173 & n.23; 175; 178.

C.   The Plaintiff's Disciplinary Process as a Whole

Temple University has an academic disciplinary procedure that, on its face, complies with the requirements of procedural due process.  The student is provided a notice of the charges against him and a copy of the basis of those charges. The student is given the opportunity to be heard by disciplinary committee members.  For serious cases, the University holds a full panel hearing, where the student can hear the testimony against him, testify, and present witnesses and evidence.  At the start of a hearing, the panel of professors and students is questioned to ensure the impartiality of each member, and panel members are trained to alert the Panel Chair or Code Administrator if they believe they cannot be impartial.  At the request of the accused student, the University will notify

student witnesses or other University members about the case and require their presence at the hearing.  The student can pose questions to the witnesses through the Panel Chair.  The student can be accompanied during the Hearing by either counsel or advisors.  The panel makes a finding of responsibility and recommends a sanction.  FoF ¶¶ 15-17; 19-26; 29; 83-84.

When serious sanctions are imposed, the panel's decision can be appealed to a Review Board, who reviews the hearing, the evidence, and the plaintiff's appeal and makes its own recommendation on responsibility and sanctions.  This process allows the student to have another group of University members review the record and allows the student to submit additional evidence and make arguments about the fairness of the hearing process.  Both recommendations are then reviewed by the final decision maker, the Vice President for Student Affairs, or her designee, who is required to review all the materials and give presumptive weight to the recommendations of the Review Board. At every stage of the process, both due process and the Code of Conduct require impartiality and a lack of bias by the decision makers and fairness in the conduct of the hearing and review. FoF ¶¶ 30-34.

It is with regret that the Court finds that, in the case of Kevin Furey, the system did not work as designed by Temple and required by due process.  Although no system is

-81-

perfect or perfectly implemented, in this case, the accumulation of mistakes at each step of the process and failures to comply with the Temple Code resulted in a violation of procedural due process.   The most serious flaws were Carry's failure to give presumptive weight to the Review Board's recommendation, his apparent deference towards Wolfe's version of events, and his ex parte conversation with a witness to the incident who did not testify at the Hearing, but other factors, such as the absence of eyewitnesses at the Hearing, the hostile tone of the Hearing, and the imbalanced questioning of the plaintiff and Wolfe, contribute to the Court's finding.

Temple has a detailed and well thought out process to protect the rights of the student while allowing Temple to reasonably allocate resources to its overall educational mission and the educational component of the disciplinary process.   Part of this process requires the decision maker to review all of the evidence and findings from both the Hearing and the Review Board. As an initial matter, Carry did not do that.   He did not review all of the evidence submitted by the plaintiff at the Hearing. The Code also requires that the final decision maker give presumptive weight to the recommendation by the Review Board. Carry did not give presumptive weight to the Review Board's recommendation that there was insufficient weight for the most serious of the charges or that suspension was the appropriate

sanction.  FoF ¶¶ 34; 156; 173-74.

That error was compounded by Carry's apparent reliance on Wolfe's position as a police officer to conclude that the plaintiff created a dangerous situation involving a police officer, a student, and a weapon, a situation in which the University consistently expels.  Despite this severe sanction, Carry did not seem to consider the possibility that Wolfe was responsible for instigating the confrontation.  And finally, Carry had an ex parte conversation with an eyewitness about the incident, who had refused to attend the Hearing to testify, although his presence had been requested by the plaintiff.  FoF ¶¶ 168-70; 175-78.

There were other aspects of the process that contribute to the Court's finding.  The Panel's determination of responsibility for all three charges turned on a factual question about the instigation and escalation of the conflict between Wolfe and the plaintiff.  The Panel heard from only the two principals of the confrontation, because other eye witnesses to the event did not attend the Hearing.  Although the plaintiff requested the attendance of the three witnesses accompanying Wolfe, the Code Administrators failed to consider whether the absence of those witnesses merited delaying the Hearing.  FoF ¶¶ 59; 61; 80; 92; 96.

In addition, the Panel started the Hearing by reading

the Hearing Summary.  This document in essence provided Wolfe's
version of events as described to the Temple campus safety
department.  The plaintiff was not given an opportunity to give
an opening statement or his version of events before testimony
began so that the Panel could understand the areas of dispute and
question University witnesses, including Wolfe, on those issues.
FoF ¶¶ 41; 85-86; 88; 91.

The Panel did not closely question Wolfe or ask many
questions to test his credibility.  The Panel permitted Wolfe to
give long narratives of his version of events and, after he
returned from a break, to read from a prepared statement in which
he, inaccurately as it turned out, stated that he had been
exonerated of any violation of police policy, and characterized
what happened at a preliminary hearing in connection with the
criminal charges against the plaintiff arising from the incident.
Again, this testimony turned out to be an incomplete description,
because the criminal charges against the plaintiff were resolved
at a later hearing.  The Chair also challenged the plaintiff
about some questions he asked to pose to Wolfe and refused to ask
other questions.  FoF ¶¶ 40; 100-04; 109-10 & n.15.

The plaintiff, on the other hand, was vigorously cross
examined by the Panel members, at times in an argumentative
manner.  The Court understands that the Hearing was made more
difficult by the plaintiff's attorney, his mother, who attended.

-84-

But the Hearing was about the student, not his mother.  It is
regrettable that the Panel and the other University officials
involved in the plaintiff's case, who were in a position of power
over the plaintiff and Boyce Furey, could not deal with the
situation in a calmer way, more conducive to finding out the
truth of what happened without the Hearing deteriorating into the
exchange of hostile words by all.  FoF ¶¶ 123-24; 128; 130-31;
133; 136-38.

     D.   <u>Qualified Immunity</u>

     In their proposed conclusions of law, the defendants
argue that they are entitled to qualified immunity in the suits
against them in their individual capacities.  Qualified immunity
provides a defense for government officials "performing
discretionary functions" so long "as their conduct does not
violate clearly established statutory or constitutional rights of
which a reasonable person would have known."  <u>Harlow v.
Fitzgerald</u>, 457 U.S. 800, 818 (1982).

     To determine whether an officer is entitled to
qualified immunity, the court must determine whether the conduct
violated a constitutional right, and whether the constitutional
right was clearly established.  <u>Saucier v. Katz</u>, 533 U.S. 194,
201-02 (2001).  Even when the right is clearly established, the
government officer is entitled to qualified immunity if he
reached a reasonable, but mistaken conclusion, that the law's

requirements were met.  Orsatti v. New Jersey State Police, 71
F.3d 480, 483 (3d Cir. 1995).  The "contours of the right must be
sufficiently clear that a reasonable official would understand
that what he is doing violates that right."  Anderson v.
Creighton, 483 U.S. 635, 640 (1987).

          As described above, the plaintiff's constitutional
right to due process in the disciplinary hearing was clearly
established.  And the Court concludes that this right was
violated.  But the constitutional violation identified by the
Court resulted from a compilation of issues with the plaintiff's
disciplinary hearing and appeal.  No one defendant was involved
in all of these aspects of the disciplinary process.  Because the
constitutional violation in this case resulted from this
combination of issues, a reasonable official in most of the
defendants' individual positions would not have known that his
actions were in violation of the plaintiff's rights.  Although
Carry was in the best position to recognize the earlier errors
and to prevent additional mistakes, given the complications and
timing of the plaintiff's disciplinary Hearing and appeal, the
Court concludes that a reasonable official in his position would
not know he had violated the plaintiff's procedural due process
rights.

          The Court therefore concludes that the individual
defendants are entitled to qualified immunity.

-86-

IV.  <u>Conclusion</u>

      The Court finds in favor of the plaintiff on his procedural due process claim.  Because his disciplinary process was in violation of due process, the plaintiff's expulsion is vacated.  The plaintiff should be reinstated as a student at Temple University unless given a new hearing that comports with due process within sixty (60) days.

      An appropriate order will issue.